Charles MILTON, Petitioner-Appellant,

v.

Raymond K. PROCUNIER, Director, Texas Department of Corrections, Respondent-Appellee.

No. 83–1910.

United States Court of Appeals, Fifth Circuit.

Oct. 10, 1984.

Rehearing and Rehearing En Banc Denied Nov. 14, 1984.

Brown, Herman, Scott, Dean & Miles, George Grant Liser, III, Fort Worth, Tex. (court-appointed), for petitioner-appellant.

Jim Mattox, Atty. Gen., Leslie A. Benitez, Paula Offenhauser, Asst. Attys. Gen., Austin, Tex., for respondent-appellee.

Before BROWN, TATE, and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Charles Milton levels eight arguments in this his first federal habeas attack upon his conviction of capital murder by a Fort Worth, Texas jury. Because this was Milton's first federal habeas petition, we granted his unopposed request for stay of execution. After an evidentiary hearing the district court dismissed Milton's petition for writ of habeas corpus. We affirm.[1]

---

**1.** We nonetheless issue a certificate of probable cause, persuaded that Milton has raised questions that reasonable jurists might answer differently.

## I

Leonard and Menaree Denton, black residents of Fort Worth, Texas, owned and operated L & M Liquor, a local liquor store. At about 2:30 p.m. a black male entered the store and after asking about a coconut cream mix, drew a .38 caliber Smith & Wesson revolver and ordered the Dentons to put the money from the register and their wallets into a paper sack. When the robber ordered the Dentons into a back room, Leonard grabbed the robber's gun while Menaree broke two wine bottles over the robber's head, with no apparent effect. In the ensuing struggle both Menaree and Leonard were shot. As they struggled, Leonard and the robber fell through the front door. Despite his wound, Leonard managed to take possession of the gun. With the approach of a customer, the robber fled leaving Leonard wounded in the doorway and Menaree dead behind the counter, shot through the heart. The gun was quickly traced to Milton. Leonard identified Milton at a police lineup.

Milton was convicted of capital murder by a Fort Worth jury which then answered the three death penalty questions required by Article 37.071(b), Tex.Code Crim.Proc. Ann. The conviction and sentence were affirmed by the Court of Criminal Appeals of Texas. *Milton v. State*, 599 S.W.2d 824, 825 (Tex.Crim.App.1980) (en banc). The Supreme Court denied certiorari. *Milton v. Texas*, 451 U.S. 1031, 101 S.Ct. 3022, 69 L.Ed.2d 400 (1980), *reh'g denied*, 453 U.S. 923, 101 S.Ct. 3160, 69 L.Ed.2d 1006 (1981). With execution scheduled for September 15, 1981, Milton on September 8 simultaneously filed petitions for writs of habeas corpus and stays of execution with the 213th Judicial District Court of Tarrant County, Texas and the Court of Criminal Appeals of Texas. The state habeas courts denied relief without an evidentiary hearing and Milton sought similar relief from the United States District Court in Fort Worth, Texas, which, without hearing or opinion, granted a stay of execution.

The district court adopted certain of a magistrate's findings, held an evidentiary hearing with regard to others, and then denied all relief. The district court later denied a certificate of probable cause. On March 2, 1984, it formally vacated the stay first granted in September, 1981. Milton's execution was set for May 5, 1984 and we issued a stay on April 25, 1984.

## II

Milton urges that: (1) insufficient evidence supported the jury finding that he deliberately caused the death; (2) the prosecutor improperly commented on his failure to testify; (3) the trial court improperly prevented voir dire into the jurors' understanding of the word "deliberately," a term Texas law deems so common as not to require definition in a jury charge; (4) the admission into evidence of prior unadjudicated offenses during the penalty phase of the trial violated the fifth, sixth, eighth and fourteenth amendments; (5) the failure of trial counsel to offer evidence in the penalty phase of the trial deprived Milton of the effective assistance of counsel; (6) by charging jurors during voir dire that they must swear that their views on capital punishment would not influence their deliberations on any issue of fact, the trial court circumvented the rule in *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); (7) the death penalty in this case is disproportionate, arbitrary, discriminatorily imposed, and based on an inadequate inquiry into future dangerousness; and (8) the conviction was the fruit of an illegal arrest and detention flowing from an impermissibly suggestive lineup. There being no question regarding exhaustion of state remedies, we discuss the merits of each in turn.

### 1.

■ Milton argues that the evidence does not support the requisite finding at the penalty stage that his shooting of Menaree was "committed deliberately and with the reasonable expectation that her death would result." The Court of Crimi-

nal Appeals of Texas rejected the same argument.[2]

We have no legally sufficient basis to quarrel with the state court's decision that there was sufficient evidence to support capital murder, whether its decision be clothed with the protection of *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981), and we think it is not, or be reviewed for evidentiary sufficiency under *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). A reasonable juror could have concluded from Leonard's trial testimony that he feared that Milton intended to kill him and his wife in the back room and that he seized the gun in a desperate effort to avoid that fate. That contemporaneous reading of the events is supported by the objective evidence and in turn supports the Texas courts in their conclusion that a jury could have concluded that Menaree's death was deliberate and that Milton's repeated ef-

forts to point the gun at her were with the reasonable expectation that death would result. At the least, any evidentiary weakness was not of constitutional proportions, cognizable in federal habeas.

## 2.

■ Milton urges that the following argument constituted an improper comment on his failure to testify:

At one point Mr. Carter, during the voir dire examination, said "you, know, this is not a monster movie." And he gave an example about the martians coming down and doing it, reasonable doubt. Boy, he's right. This is a nightmare. People, *a person who lived through that nightmare is still here to tell you about it.* Easiest thing in the world for you to do is not to find him guilty of capital murder. But, you know, we picked a jury. Twelve people who had the integri-

---

2. That court stated:

Milton also challenges the sufficiency of the evidence at the punishment phase to support the jury's answers to special issues numbers one and two as required by Article 37.071(b), V.A.C.C.P. As to the issue of whether Milton's conduct "that caused the death of the deceased was committed deliberately," the evidence shows that Milton entered a liquor store in Fort Worth that was owned by Leonard and Menaree Denton. Milton pointed a gun at Mrs. Denton and ordered her to give him the money in the cash register. He then ordered the Dentons to the store's back room. Mr. Denton grabbed the barrel of Milton's pistol and started struggling for the gun. According to Denton, Milton kept trying to point the gun again and again at Mrs. Denton. Mrs. Denton broke two wine bottles over Milton's head but the fight continued. The gun went off, killing Mrs. Denton. Denton then yelled, "Why don't you leave? Haven't you done enough? You've killed my wife." Denton testified that Milton replied, "Hell no, I haven't killed her yet, but she is going to die."

On cross-examination, the following exchange occurred:

"Q. All right, and you yourself, Mr. Denton, being honest—you can't tell this jury that this gun didn't go off by accident while you two were struggling, can you?

"A. By accident, no sir. I can't say that the man didn't pull the trigger. He pulled the trigger this—he was steady, pulling the gun down on my wife each time I would push it away from him. This is what he was trying to do.

"Q. He was—he was steady pulling the gun, but you were steady pulling the gun, too?

"A. I was steady pushing the gun away from him, sir.

"Q. Pushing this way and that way (attorney indicating)?

"A. Yes, sir.

"Q. And you can't tell this jury that this gun wasn't discharged by accident, can you, sir?

"A. I can't say that it wasn't discharged by intentional.

"Q. Mr. Denton, please sir.

The question is: can you tell this—you can't tell this jury that this gun wasn't discharged by accident, can you, sir?

"A. I don't see why it would be, sir."

In *Smith v. State*, 540 S.W.2d 693 (Tex.Cr. App.1976), we found the conduct there to have been committed deliberately when there was no evidence that the defendant was under the domination of anyone, nor was he under any mental or emotional pressure. Though Milton argues that the evidence shows an accidental discharge of the pistol, we disagree. Taken in the light most favorable to the verdict, the evidence demonstrates that Milton continually kept attempting to point the gun at Mrs. Denton but was prevented from doing so by Mr. Denton until the fatal discharge. From the evidence of Milton's conduct, one must conclude that Milton "could reasonably expect that death would result" from his conduct. *Granviel v. State*, 552 S.W.2d 107 (Tex. Cr.App.1976).

599 S.W.2d at 826–827.

ty, the backbone to bow their necks and call it like they see it. I think you're that jury. (emphasis supplied.)

Texas argues that viewed in context the argument concerning the person "still here to tell [the jury] about it," stepped on no right of Milton. "The test we must apply is 'whether or not the statement was manifestly intended or was of such character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'" *United States v. Jennings*, 527 F.2d 862, 871 (5th Cir.1976), *quoting United States v. Wilson*, 500 F.2d 715, 721 (5th Cir.1974), *cert. denied*, 420 U.S. 977, 95 S.Ct. 1403, 43 L.Ed.2d 658 (1975). Texas has not invoked its contemporaneous objection rule, but the absence of objection by two experienced and able defense counsel supports a common-sense interpretation that the reference would not naturally and necessarily be taken to be a comment on Milton's protected silence. Petitioner has pointed to nothing suggesting that the prosecutor so intended and we found nothing in our review of the record. The argument is without merit.

### 3.

■ Milton urges that the refusal of the state trial judge to allow his counsel to inquire into the veniremen's understanding of the terms "deliberately," "probability" and "criminal acts of violence" denied him due process and his sixth amendment rights to trial by jury and counsel.[3]

■ During jury selection, the court sustained objections to the efforts of Milton's counsel to inquire into the jurors' understanding of the terms "deliberately" and "criminal acts of violence." Under Texas law, these terms are sufficiently common that their definition is not required in a jury charge under the capital murder statute. Moreover, counsel has no right to ask prospective jurors to articulate their understanding of the language. *Battie v. State*, 551 S.W.2d 401, 405 (Tex.Crim.App.), *cert.*

*denied*, 434 U.S. 1041, 98 S.Ct. 782, 54 L.Ed.2d 790 (1977).

Milton's theory is that this limitation on voir dire violated rights secured to him by the sixth and fourteenth amendments. The inability to pursue this inquiry, he posits, is so unfair as to deprive him of due process, and so limited his capacity to conduct meaningful voir dire as to deprive him of the effective assistance of counsel. An English professor at Texas Christian University testified at the evidentiary hearing on the federal habeas. The professor, who had extensive training in linguistics and semantics, explained that each of the terms were commonly used to mean different things. His testimony, however, did not place the words in the context of the charge and trial, where the evidence, the argument of counsel, and the context of the charge itself lend definition to abstractly ambiguous words. For example, he explained that violent acts of a criminal nature could mean assaultive type behavior or could refer to a temper tantrum. He conceded, however, that this understanding was unlikely when placed in the context of a criminal trial. Similarly, he explained that "deliberately" could mean purposefully or it could mean doing an act slowly or with care.

But we do not need the aid of specialized study to be aware that commonly used words may have multiple common understandings. The difficulty with Milton's argument is that it stops halfway up the hill. That a word without context has multiple meanings is the beginning, not the end, of inquiry into whether or not allowing attorneys to ask veniremen their understandings of these words was constitutional error.

One purpose of voir dire is to gain information important to the exercise of peremptory challenges. Yet, and perhaps nearly always, another purpose is to provide a springboard for the advocate. Probing a venireman's understanding without

---

**3.** Milton's brief seems to argue the limit on voir dire as a denial of counsel as well as of due process and sixth amendment jury rights. This oblique effort to assist his argument by the added characterization of denied counsel adds nothing to our inquiry.

the flesh of context and before trial could doubtlessly be used and be welcomed by the advocate as a tool of persuasion. But usefulness to counsel, whose persuasive skills otherwise find procedural expression, is not constitutional right and we pass quickly to Milton's more basic point.

The federal district court acknowledged the expert testimony that different people might attach differing meanings to the words, but agreed with the Texas courts that blocking inquiry into this area of questioning was not an abuse of discretion. The court quoted the Court of Criminal Appeals, noting that: "[v]oir dire examination could take an unreasonable length of time if attorneys on both sides selected different words throughout a contemplated charge and asked each prospective juror what those words meant." *Milton v. State*, 599 S.W.2d at 826, *quoting Chambers v. State*, 568 S.W.2d 313, 323 (Tex. Crim.App.1978), *cert. denied*, 440 U.S. 928, 99 S.Ct. 1264, 59 L.Ed.2d 484 (1979). We agree, as far as the argument goes. The state certainly has an interest in seeing that voir dire is not unnecessarily protracted. And with the difficulties of selection in capital cases, including such delicate matters as the *Witherspoon* standard, lengthy voir dire is the norm.[4] Arguably, when it takes weeks to select a jury to hear two days of testimony, the argument that refusing to allow inquiry into the meaning of the words is justifiable as an effort to reasonably contain the voir dire, is not compelling. But so it would be with any area of inquiry which in isolation makes only a marginal contribution to the overall time consumed. We have read the record and it reflects, as a whole, a painstaking voir dire conducted by skilled counsel under the superintendence of a patient trial judge. We have little difficulty concluding that there was no abuse of the trial court's discretion here. In so holding, we emphasize that a trial court must be accorded wide leeway in its control over the trial scene, particularly voir dire. That deference is owed by a

court charged with the responsibility of direct review. As a federal habeas court, even more remote in time, distance, and function the debt of deference is greater.

The more acute question, however, is not the reasonableness of this restriction on voir dire, but the related question of whether the words undefined by the court are sufficiently narrow in their meaning, in context, that the jury received the guidance required in capital cases. *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), in its approval of the Texas scheme for capital punishment, answers the question, at least in the abstract. In the context of this case, we are not persuaded that the jurors could reasonably take these words to mean significantly different things. To the extent that the words strike distinct chords in individual jurors, or play to differing philosophies and attitudes, nothing more is at work than the jury system. Our effort to define reasonable doubt in non-tautological terms is instructive. "Reasonable doubt is a doubt based on reason" or similar phrasings is the usual result. The answer is that such words, often of great consequence, do have a common understanding in the sense that they ultimately mean what the jury says by their verdict they mean. But it does not follow that it is essential to explore each venireman's understanding of their meaning. To the contrary, their meaning is expressed in an application or result rather than a second definitional formulation.

In sum, the lawyers were not circumscribed in their final arguments. Using the charge as their springboard, they argued at length the inferences they wished the jury to draw. The jury requested no clarification. We conclude that in context the accused words did have a plain meaning of sufficient content that the discretion left to the jury was no more than that inherent in the jury system itself. It follows that refusal to allow exploration of their meaning in voir dire presents no issue distinct from

---

**4.** The selection of Milton's jury was typical. Approximately fifteen of the seventeen volumes of trial transcript were devoted to jury selection.

the general question of the overall adequacy of the voir dire, measured by an abuse of discretion. Otherwise stated, the limits imposed on voir dire did not rise to the level of a constitutional deprivation of right to counsel, jury or due process.

4.

■ Milton argues that it was error of constitutional magnitude to admit "unadjudicated" extraneous offenses into evidence at the sentencing phase of his trial. In federal habeas, we review evidentiary rulings by a state trial judge by the standard that "the erroneous admission of prejudicial testimony does not justify habeas corpus relief unless it is 'material in the sense of a crucial, critical, highly significant factor.'" *Skillern v. Estelle*, 720 F.2d 839, 852 (5th Cir.1983), *quoting Porter v. Estelle*, 709 F.2d 944, 957 (5th Cir.1983).

■ The state put before the jury evidence that, in addition to a conviction in 1972 for theft over fifty dollars, Milton unlawfully carried a pistol and that on each of the two days before the Denton murder he committed an armed robbery. Each victim of the armed robberies testified that Milton entered their store, demanded their money and ordered them to a back room while he made his escape.

The Court of Criminal Appeals of Texas rejected Milton's contention that the admission of this evidence was error. So do we, for essentially the same reasons. The focus of Article 37.071(c), Tex.Code Crim. Proc.Ann. is in part predictive. While it assigns a difficult task to juries in capital crimes, the inquiry into a defendant's probable future conduct is responsive to the constitutionally rooted concern that the death penalty not be administered in an arbitrary or capricious way. Certainly all "relevant" information ought to be before a jury facing this task. At the same time there remains a long-held reservation about the use of wrongdoing not then being tried. These concerns express our acceptance that a jury suffers the human weakness of blending wrongs—a result inconsistent with our fundamental commitment to charge specificity, jeopardy and due process. But these concerns are addressed by properly applied standards of relevance and sufficiency of proof. Moreover, the underlying concern that a jury may allow proof that a defendant is a bad person to color its assessment of present guilt is absent when extraneous offenses are received, as here, only at the sentencing phase.[5]

---

5. We must also emphasize the structure of the Texas death penalty system. Under Texas law, before the inquiries of Tex.Code Crim. Proc. art. 37.071(b) are even submitted to the jury, the jury must find that murder was committed under one of five circumstances, including "in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated rape, or arson." Tex.Penal Code § 19.03(a). Thus, Texas law in effect provides for a determination to be made during the guilt phase that other states reserve for the sentencing phase. As the Supreme Court noted in *Jurek*, "While Texas has not adopted a list of statutory aggravating circumstances the existence of which can justify the imposition of the death penalty as have Georgia and Florida, its action in narrowing the categories of murders for which a death sentence may ever be imposed serves much the same purpose." 428 U.S. at 270, 96 S.Ct. at 2955.

Evidence of the extraneous offense was not introduced here until the sentencing phase. Thus, there can be no possibility that it infected the jury's determination that Autry committed murder under an "aggravating circumstance." The Supreme Court's 1976 decisions require that before the death penalty may be imposed, the sentencing authority must find the presence of at least one statutory aggravating factor, and then must weight the evidence of mitigating factors adduced by the defendant. *Gregg v. Georgia,* 428 U.S. 153, 206–07, 96 S.Ct. 2909, 2940–41, 49 L.Ed.2d 859 (1976); *Jurek v. Texas,* 428 U.S. at 276, 96 S.Ct. at 2958. While the admission of evidence of an extraneous offense in the second phase of a Texas bifurcated proceeding must be watched closely and may implicate other constitutional concerns, we point out that it in no way undermines the constitutionally mandated procedures for imposition of the death sentence set forth by the Supreme Court in *Jurek* and the other 1976 decisions. Texas decisions have uniformly approved the admission of extraneous offenses at the sentencing phase. *Rumbaugh v. State,* 629 S.W.2d 747, 754 (Tex. Crim.App.1982); *Williams v. State,* 622 S.W.2d 116, 120 (Tex.Crim.App.1981), *cert. denied,* 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982); *Brooks v. State,* 599 S.W.2d 312, 322 (Tex.Crim.App.1979), *cert. denied,* 453

5.

a.

Milton next turns his attack on his trial counsel, urging that their representation was constitutionally ineffective in their decision not to offer evidence in the punishment trial. As mentioned, on May 26, 1983 the United States District Court held an evidentiary hearing upon four of Milton's claims, including ineffective assistance of counsel.[6] The district court heard the testimony of ten persons, including Milton and Don Carter, one of his trial counsel. Harry Williams, Milton's lead trial counsel, had died about two weeks before the evidentiary hearing.

Milton testified that he asked Williams "if he could testify" during the sentencing phase of the trial but Williams neither allowed him to do so nor told him why he could not. He also testified that at the time of trial he had two sisters and a brother living in Fort Worth; that he gave Williams their names, the name of "Reverend" Brown as well as his "bossman's" name. None testified at Milton's trial. Reverend Brown testified that he met with Milton on one occasion but could not recall the subjects discussed, that Williams had attended the church service he conducted each Sunday in jail, and that he would have so testified at Milton's trial if he had been asked.

Joyce Smith, a sister of Milton, testified that Milton was a good boy when he was young and was not "given to" acts of violence; that he would baby-sit her children and occasionally accompany her to church; that she would have so testified at Milton's trial if asked to do so and would have also told the jury that she did not think that he would again commit criminal acts of vio-

lence. She also acknowledged that Milton "had a pretty extensive drug problem" but denied knowledge of his earlier robberies. James Lee Smith, Milton's brother-in-law, and Frankie Smith, his sister, gave similar testimony.

Don Carter, the junior trial counsel, testified that when he was appointed to assist Harry Williams in the trial his trial experience included some fifty trials and in addition to private practice approximately three years in the local district attorney's office. Carter explained that Williams had investigated the case assisted by Bob Jones, a local investigator. He recalled discussing trial strategy with Williams in the presence of Milton and although unable to recall specific details, he remarked that the discussion included whether Milton ought to testify. He also confirmed that Milton had wanted to testify. Carter also explained he and Williams were concerned about the extent of the available evidence of extraneous offenses that might be developed should Milton and members of his family testify. These included, in addition to the extraneous robbery and gun charges which were brought out, a conviction for theft over fifty dollars,[7] possessing heroin and that Milton had needle marks on his arm and had "shot up the ward" at a local hospital where he was being treated for drug addiction. Carter explained that this concern that the prosecutor would use members of Milton's family to give flesh to the extraneous offenses was also a factor in the decision not to call them. Carter testified that he was more concerned with the possibility of the prosecutor's "have you heard" questions, such as "Have you heard he was a heroin addict?" than with the other crimi-

U.S. 913, 101 S.Ct. 3146, 69 L.Ed.2d 996 (1981).

*Autry v. Estelle,* 706 F.2d 1394, 1406 n. 5 (5th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 1458, 79 L.Ed.2d 906 (1984).

**6.** The district court adopted the recommendations of a magistrate regarding the claims of illegal arrest, self-incrimination (comment of prosecutor on failure to testify), sufficiency of evidence and the constitutionality of the death

penalty statute. It ordered an evidentiary hearing on four issues which it "identified": impermissible lineup, jury selection, use of extraneous offenses and ineffective assistance of counsel.

**7.** Evidence of the theft was admitted at the punishment phase and Carter's recollection here was faulty.

nal charges.[8] Carter summarized his testimony before the federal district court with the explanation that:

> all the things combined, we made a strategy decision not to put on any of the family members because they weren't good witnesses. There were extraneous matters that could be brought out, and we were concerned about all of these things, not just the fact that they could ask the witnesses whether or not he had a heroin problem.

There was also evidence that Williams, about age sixty when he died, was the public defender assigned to the trial court, and enjoyed an excellent reputation while trying fifteen to twenty felony cases a year; and that Carter was rated by a bar poll as one of the top ten criminal defense attorneys in Fort Worth.

b.

The Court in *Strickland v. Washington*, —— U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) explained that

> ... [a] claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a

breakdown in the adversary process that renders the result unreliable.

104 S.Ct. at 2064.

The Court counseled that "[j]udicial scrutiny of counsel's performance must be highly deferential." 104 S.Ct. at 2065. Our assessment of counsel's performance requires us to make every effort to eliminate the distorting effects of hindsight and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties of assessing counsel's performance, the Court has directed us to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" 104 S.Ct. 2066 (citation omitted).

"The defendant must show that there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different." 104 S.Ct. at 2068. "[T]he question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." 104 S.Ct. at 2069.

We are not persuaded that the work of Milton's counsel was deficient, or if it was, that it affected the outcome of the case. Williams and Carter made the difficult decisions not uncommon for experienced trial counsel. Perhaps with hindsight they might have tacked earlier, or later. Regardless, their decisions fit well within a range of tactical choices not to be second-guessed.[9] We are not unaware of

---

**8.** Pointing to *White v. State*, 590 S.W.2d 936 (Tex.Cr.App.1979), Milton suggests that counsel's apprehension about the "have you heard" questions was unjustified because they were objectionable under Texas law. However the law of Texas at the time of trial was represented by *Childs v. State*, 491 S.W.2d 907 (Tex.Cr.App. 1973). Childs was overruled in *Ward v. State*, 591 S.W.2d 810 (Tex.Cr.App.1979) (en banc).

See *White v. State*, 590 S.W.2d 936, 937 (Tex.Cr. App.1979).

**9.** It bears mention that this was the first death penalty returned in Fort Worth for the slaying by one black of another. We do not doubt that this reality, particularly when the victim was the proprietor of a liquor store, was part of counsel's decisional calculus. That we do not sanction the paternalism and racist components un-

the defensive need to present to a jury a defendant's human qualities, particularly in a capital case, an effort that might well make use of brothers, sisters and the defendant himself as much to remind the jury of the defendant's humanity as to impart information. But these veteran lawyers were doubtlessly equally aware of these fundamentals of trial persuasion and human motivation. The decision to not offer evidence at the punishment phase was not defective in the constitutional sense. Milton received the counsel guaranteed to him by the Constitution.

6.

 Milton argues that the trial judge, by instructing the jury during voir dire that it was their duty to answer questions propounded to them without any consideration that the death penalty was involved, violated the principle of *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). We note also, although not specifically pointed out by petitioner, that each juror when selected took the oath that "the mandatory punishment of death or imprisonment for life will not affect your deliberations on any issue of fact so help you God?" The jury's written instructions which accompanied the three death penalty questions also included an instruction that "During your deliberations you shall not consider or discuss what the effect of your answer to the above issues might be. More particularly, you are not to consider or discuss any possible actions of the Board of Pardons and Paroles or the governor nor how long this defendant will be requested to serve." [10]

The state replies that such instructions are not contrary to *Adams v. Texas* because no jurors were excluded and the Texas statute which requires that jurors take

derlying such jury acts is not relevant. A trial lawyer operates with the citizens as he finds them—with all their bias and prejudice and nobility, as well.

**10.** In instructing the jury not to consider such effects the court to some degree narrows the inquiry into future dangerousness. It is the obverse of *Ramos.* "By bringing to the jury's attention the possibility that the defendant may

the oath described has not been found to be unconstitutional. To the contrary, the argument continues, the court in *Adams* sustained its constitutionality.

In *Adams,* jurors who were unwilling to take this very oath were excluded. Such exclusions, required by § 12.31(b) of the Texas Penal Code, were found to contravene the Sixth and Fourteenth Amendments as construed and applied in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). At the same time the court explained that the state has the right to have excluded for cause those veniremen who cannot, without bias or distortion, answer the statutory questions requisite for the death penalty in Texas.

*Witherspoon* is, of course, a limitation upon the power of the state to exclude. Milton's argument is that it follows that the state is not entitled to an instruction that a juror will not be affected in his deliberation by the circumstance that death is a possible result; that it frustrates the *Adams* rule against excluding jurors whose deliberation will be affected because death is a possibility to instruct jurors that they are not to be so affected. Relatedly, Milton argues that the jury was told before voir dire that it was their duty to answer the questions propounded without any consideration that the death penalty was involved. No jurors were excluded contrary to *Adams v. Texas,* the argument continues, only "because they had been instructed by the judge that it was their duty not to consider the death penalty in answering their questions." The accused instruction read (emphasis added):

So you see that even though you as a juror are not signing your name to the word "D-E-A-T-H," if the jury should return three "Yes" answers, you are in-

be returned to society, the Briggs Instruction [telling the jury of the possibility of commutation of sentence] invites the jury to assess whether the defendant is someone whose probable future behavior makes it undesirable that he be permitted to return to society." *California v. Ramos,* 463 U.S. 992, 103 S.Ct. 3446, 3454, 77 L.Ed.2d 1171 (1983).

structing me that that's what I must do, and I will do so. So that doesn't leave much doubt in your mind but what you know what are doing.

Now, here is where the law gets just a little bit difficult and quite a bit tough. It says that—I am now going to quote from Article 12.31(b) of the Texas Penal Code that says this: "The prospective jurors shall be informed that a sentence of life imprisonment or death is mandatory upon the conviction of a capital felony, and a prospective juror shall be disqualified from serving as a juror unless he states under oath that the mandatory penalty of death of imprisonment for life will not affect this deliberation on any issue of fact."

Now, let's examine that just a minute to see what it means, and *what it means is this: when you are selected as a juror, you will be given an oath that you will determine the facts in the case you are serving on strictly from the evidence you hear and from nothing else and from no other source and that you will call it just exactly the way that you see it regardless of the outcome.* So what that really means when you come down to it is, when you get back in the jury room if you were on a jury in which a capital murder verdict had been returned and were deliberating on the punishment and you had two of those questions to answer and you felt under the evidence that two questions had to be answered "Yes," then it would be your duty to answer those two questions "Yes" even though you know full well it's going to result in a death penalty.

By the same token, if you felt that one of those questions should be answered "No," it's your duty to answer that question "No" because it needs to be answered "No," not because I don't want to vote a death penalty.

Now do you see the difference? It's important that you do.

*You're going to have to decide a capital case strictly on its own facts and nothing else without regard to the effect of your answers. If it comes out with two yeses or if it comes out with two noes or one yes and one no, then so be it so long as that's the way you see it.*

The second wing of Milton's argument is quickly dispatched. The quoted instruction did not confine the veniremen's answers in the course of voir dire.

The first wing of Milton's argument is more difficult. If the state cannot exclude a juror unable to swear that his deliberations will not be "affected" by the possibility of a life or death sentence, it is uncertain why the state has the right to insist that the jurors be sworn that such a possibility will not affect their deliberations. If the premise of *Adams* is that a juror's range of discretion cannot be drawn more tightly than an orbit which allows a juror to be affected by the circumstance that death is a possible punishment while excluding those unable to follow the law, instructing jurors that death will not affect their deliberations raises concern.

In *Brooks v. Estelle,* 697 F.2d 586 (5th Cir.1982), the jurors were, as here, required to take the Texas oath. We concluded that *Adams* was inapplicable because no jurors were excluded. This panel is bound by that decision and does not retreat from it, but we admit to uncertainty as to the elusive doctrinal premise of *Adams.* It is unclear how a defendant's right to a fair cross section of citizens in his jury trial is violated by excluding jurors who cannot swear that the potential of a death verdict will affect their deliberation if the litmus oath is constitutional.

*Adams* may be in one sense a prophylactic implementation of *Witherspoon,* and no more, with any incongruity in logic or concept giving way to felt necessity. It may be that "affect" is seen as descriptive of a continuum of reactions to the capital offense by veniremen, from those who are only reflecting the qualitative difference of death as a punishment by increased sensitivity to their task, to those for whom death introduces such bias and prejudice that they are to be unable to follow the

law. So viewed, the exclusion of a venireman who has only conceded he will be affected would violate *Witherspoon.* But taking the oath that a person would not be affected would not, absent further evidence of where on the continuum the juror was. That is, excluding a juror because his bias will not allow him to follow the law and instructing juries to follow the law are not inconsistent. The key is what the jury is being told when instructed that they will not be affected.

The state trial judge explained to the jury that their answers to the three questions would determine whether Milton received a life or death sentence. We are not persuaded that, on the whole, the jury was instructed to be insensitive to the reality that life was an issue. Rather, the jury was told not to allow that reality to distort their fact-finding role. A juror who would do so would have been excludable under *Witherspoon.* Thus, "affect" was used by the state trial judge in its permissible sense.

In the ordinary course of case-to-case decisionmaking, we might not so readily expose our uncertainty, but would be content to leave the matter to the aid of the maturation and percolation functions of our sister circuits. But as death-sentenced prisoners would surely argue, with death cases that process is difficult to lean so heavily upon. With deference, we are driven then to only state the riddle, leaving to the propounder the answer—if it is other than we found in *Brooks.*

7.

Relying upon *Harris v. Pulley,* 692 F.2d 1189 (9th Cir.1982) Milton attacks his conviction for lack of a proportionality review. The Supreme Court rejected this argument in *Pulley v. Harris,* — U.S. ——, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).

8.

Finally, Milton argues that his arrest was the product of an impermissibly suggestive lineup at which he was identified by Denton as his assailant and his wife's killer. The evidentiary hearing conducted by the federal district court included evidence about the lineup, including photographs of the lineup, as well as the testimony of attorney Bill Chambers, who represented Milton at the lineup, and Darrell Thompson, then a detective with the Fort Worth Police Department. Detective Thompson testified that Milton was placed in a lineup with four other black males. He testified that Milton was not the only person in the lineup with facial hair and that the heights were 5′5″ (Milton), 5′7″, 5′9″, 5′8″, and 5′11″. Finally, he expressed the opinion that the participants in the lineup closely resembled Milton. Milton testified that the other persons did not resemble him; that they had facial hair and did not have straight hair as he did.

The lineup occurred fourteen days after the offense and Denton identified only Milton. Recalling the face-to-face encounter by Denton of his assailant and the evidence developed at the evidentiary hearing, there is no basis for concluding that a substantial likelihood of misidentification existed. *See Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Branch v. Estelle,* 631 F.2d 1229, 1234 (5th Cir.1980). The district court findings are not clearly erroneous.

AFFIRMED.

TATE, Circuit Judge, concurring.

I concur in the panel's opinion. With regard to the ineffective assistance of counsel issue, I agree with the majority that the Supreme Court's latest pronouncement in *Strickland v. Washington,* — U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), seems, under the general Sixth Amendment test there announced, to require us to reject what would otherwise be a compelling argument. To me at least, Milton's otherwise-excellent counsel, perhaps through overconfidence, was prejudicially ineffective in failing to present *any* mitigating evidence whatsoever at the sen-

tencing phase following conviction, although some was available.[1]

Nevertheless, in *Strickland*, the Court seems to have held that Sixth Amendment ineffectiveness claims require that "the defendant affirmatively prove prejudice," —— U.S. at ——, 104 S.Ct. at 2067, in determining whether "counsel's assistance was so defective as to require reversal of a conviction or death penalty," —— U.S. at ——, 104 S.Ct. at 2065. However much I myself may think that Milton's chances of receiving life imprisonment instead of a capital sentence would have been much improved, if the jury had been presented individualized evidence that he was a human being and that he had no extended record of violent crime, nevertheless, under the *Strickland* test, apparently we cannot say that counsel was ineffective unless it is shown affirmatively that the death penalty would not have been imposed had the sentencing jury been afforded this testimony— virtually an impossible burden, I might add, as to a jury's life-death discretionary determination.

Under the facts of this case, however, while the deficiency of counsel may not under *Strickland* constitute unconstitutional Sixth Amendment ineffectiveness, nevertheless it may run afoul of Eighth Amendment concerns against the unreliable, arbitrary, and freakish imposition of the capital sentence, condemned by the Supreme Court over the past twelve years;[2] I write separately to express that concern.

## I.

Milton was convicted of the killing, during an armed robbery, of the wife of a proprietor of a liquor store. The proprietor, an elderly man, attempted to disarm Milton. In the struggle between them, the proprietor's wife was killed. Despite Milton's counsel's argument that the shooting was accidental (Milton chose not to take the stand), the jury accepted the uncontradicted testimony of the proprietor that the killing was deliberate. I have no question in my mind but that the jury's conviction of the capital offense, that made Milton a *candidate* for execution, is completely supported by the evidence and that he therefore deserves severe punishment, whether it be execution or life imprisonment.

My doubts, rather, arise from the circumstance that Milton's counsel chose not to place before the jury any mitigating circumstances whatsoever, although some were available, by which the jury might determine that this defendant was a human being and one as to whom there was no *"probability"* that he "would commit criminal acts of violence that would constitute a continuing threat to society," one of three questions propounded to the sentencing jury that, to invoke the death sentence, required an affirmative jury answer. Tex. Code Crim.Pro. Art. 37.071(b) (emphasis added). Under the facts of this offense, after all, although this was a cold-blooded armed robbery, it was a hot-blooded (rather than cold-blooded) killing, and the jury might well have found the ultimate penalty unwarranted if, on a view of Milton's life circumstances, it had found there was no reasonable probability that he would continue to commit acts of violence. Instead, on the basis of the uncontested testimony of the prosecution, the sentencing jury was given no reason to conclude that the death penalty was unwarranted.

After hearing the affecting testimony of the elderly proprietor of the killing of his wife of thirty-eight years, the jury returned a verdict of guilty of the capital offense at

**1.** Like the majority, I am also concerned that the principles of *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), may have been offended by the state trial judge's instruction during voir dire that the jurors were required to answer the death-penalty-producing questions propounded to them, *without* any consideration that the death penalty was involved. However, in *Brooks v. Estelle,* 697 F.2d 586 (5th Cir.1982), another panel of this court

rejected a similar contention. By the "law of the circuit," we are bound by that decision, in the absence of en banc overruling or Supreme Court modification of the *Brooks* ruling.

**2.** *See, e.g., Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

9:10 AM, October 9, 1978. R. XIX, p. 2330. The penalty phase of the trial commenced at 10:15 AM and concluded at 2:24 PM, with only the state producing evidence (to be described below). R. XIX, pp. 2335–2378. The jury retired at 3:24 PM and returned at 4:50 PM, R. XIX, p. 2412, apparently with little difficulty concluding that the death-sentence-resulting questions should be answered in the affirmative.

The *only* evidence produced at the sentencing hearing was that of the prosecution. This evidence consisted of proof of Milton's 1972 conviction of felony theft; proof that a few days before the present robbery of June 24, 1977, Milton was found unlawfully carrying a pistol; and proof that on each of the two days before the present robbery Milton had committed an armed robbery (although he had not harmed the victims therein).

On this, the only evidence before the sentencing jury, the jury could quite reasonably have concluded that Milton was a violent criminal without redeeming individual aspects. The jury was not given the opportunity to hear the testimony of Milton's two sisters and his brother and members of their family that would indicate he was a human being, without any history of violent crime until just two days before the present robbery—a member of a family, loved by them and loving them, kind to children, essentially peaceful in nature.

The decision not to present to the sentencing jury this evidence, in the face of the prosecution's uncontradicted evidence of Milton's (recent) violent acts, is almost certainly one that was unwise and, perhaps, arose from overconfidence that the jury would not impose a capital sentence. The now-advanced fear that the jury might learn of Milton's drug addiction, even conceding that at least some of the jurors might view this as an aggravating rather than mitigating circumstance, pales in significance, when one considers the prosecution's unopposed evidence indicating that Milton was *only* a violent criminal—rather than one who had turned to violent crime only two days before the present robbery,

and who otherwise had a non-violent and rather minor criminal record, and who was a member of the human race beloved by his family—and the death-sentence-resulting interrogatory by which the jury was to conclude whether there was a "probability" that Milton would continue to commit violent crimes. Production of such mitigating evidence would usually be deemed an essential move of effective counsel, if only to lengthen the time between the evidence leading to Milton's conviction of the crime itself, with its affecting details, and the time the sentencing jury retired to perform its awesome sentencing responsibilities. Those responsibilities required the jury, before deciding on death, to take into consideration not only the facts of the crime itself, but also the broader issue of whether "the unique circumstances of this individual defendant," *Spaziano v. Florida,* —— U.S. ——, ——, 104 S.Ct. 3154, 3162, 82 L.Ed.2d 340 (1984), made it appropriate that he should be executed rather than sent to live in prison for the rest of his life.

On the record before us, I am convinced that counsel erred in failing to offer to the sentencing jury any mitigating evidence whatsoever by which the jurors could view Milton as a human being, with some good qualities, rather than *only* as an armed robber who had evilly killed a victim of his robbery. Nevertheless, under at least the wording of *Strickland,* I cannot say that Milton has affirmatively shown, as required by that decision, that his counsel was ineffective in a Sixth Amendment sense: for I cannot say, nor can anyone (*see* II *infra*), that the jury probably would not have meted the death penalty even had this mitigating evidence been presented for its consideration.

However, Eighth Amendment concerns are aroused in me by our mechanical application of *Strickland*'s Sixth Amendment standard to the facts of this case. Unless the death penalty is *always* appropriate when a victim is killed in the course of an armed robbery—and the Supreme Court has held it is *not*—, Milton's counsel's failure to offer available mitigating, humaniz-

ing evidence at the sentencing hearing failed to assure him that his sentencing jury would not arbitrarily and unconstitutionally impose the death sentence by failing to consider "the circumstances of each individual homicide and individual defendant in deciding whether the death penalty is to be imposed." *Proffitt v. Florida,* 428 U.S. 242, 258, 96 S.Ct. 2960, 2969, 49 L.Ed.2d 913 (1976).

Indeed, in upholding the Texas capital sentencing scheme, the Supreme Court stated:

> [A] sentencing system that allowed the jury to consider only aggravating circumstances would almost certainly fall short of providing the individualized sentencing determination that we today have held in *Woodson v. North Carolina,* 428 U.S. 280, 303–305, 96 S.Ct. 2978, 2991–2992, 49 L.Ed.2d 944, to be required by the Eighth and Fourteenth Amendments. For such a system would approach the mandatory laws that we today hold unconstitutional in *Woodson* and *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974. A jury must be allowed to consider on the basis of all relevant evidence not only why a death sentence should be imposed, but also why it should not be imposed.
>
> Thus, in order to meet the requirement of the Eighth and Fourteenth Amendments, a capital-sentencing system must allow the sentencing authority to consider mitigating circumstances.

*Jurek v. Texas,* 428 U.S. 262, 271, 96 S.Ct. 2950, 2956, 49 L.Ed.2d 929 (1976).

The sentencing scheme of Texas meets, of course, this constitutional requirement. Under the state procedure, Milton's counsel was entitled to offer mitigating evidence.

What is troubling to me, however, is that counsel's failure to offer this available mitigating evidence, although not a Sixth Amendment ineffectiveness, may in consequence have produced a capital sentence violative of Eighth Amendment standards. We have before us a death penalty that may have been freakishly and arbitrarily imposed, through the failure to afford the jury "relevant evidence ... why it should *not* be imposed," *Jurek, supra* (emphasis added)—and that may no less offend the Eighth Amendment because Milton's own counsel chose not to avail himself of Eighth Amendment protections, than if the state had prevented Milton's sentencing jury from receiving this available relevant evidence.

## II.

*Strickland* applied its Sixth Amendment standards to claims of ineffectiveness of counsel in the sentencing process. The claims of ineffectiveness there concerned in truth, matters of professional judgment as to which reasonable minds might differ. There may be doubt, in my view that *Strickland*'s pronouncement requiring an affirmative burden upon the applicant for relief to show prejudice—in short, that the death penalty would not have otherwise resulted—was necessarily intended to apply when, as a result of a counsel's lapse that on review does not seem supportable as sound trial strategy, the defendant is deprived of an Eighth Amendment protection against an arbitrary capital sentence through a failure to present to the sentencing jury any mitigating evidence whatsoever, although some is available.

In the present case, Milton's lawyer presented no mitigating evidence at the sentencing hearing—nothing to describe the petitioner's humanity or his fitness to continue life in this world. Whether or not he so failed because of an overconfident belief that this was an inappropriate case for the death penalty, there seems to me to be little professional justification for the failure. Because of it, the petitioner was denied the "professionally competent assistance" demanded by *Strickland v. Washington,* 104 S.Ct. at 2066. But the panel cannot say that, absent the lawyer's failures, "the decision reached would reasonably likely have been different." *Strickland,* —— U.S. at ——, 104 S.Ct. at 2069.

The nub of the resulting problem is this. We almost never can make that determina-

tion of prejudice as to death sentences, when no mitigating evidence whatsoever is presented at the sentencing hearing. The death sentence now may be imposed only on persons convicted of intentional murders,[3] and it is almost impossible on subsequent review to assess what evidence, not presented to the factfinder, would permit us to conclude after-the-fact that a sentence other than death "reasonably likely" would have resulted. Yet this course seems in direct conflict with the Eighth Amendment imperative requiring capital sentencers to consider all evidence mitigating against the punishment of death and militating in favor of recognition of the essential humanity of the defendant before the sentencer.

A death sentence is "a denial of the executed person's humanity." *Furman v. Georgia*, 408 U.S. 238, 290, 92 S.Ct. 2726, 2752, 33 L.Ed.2d 346 (1972). It "is ultimately understood only as an expression of the community's outrage—its sense that an individual has lost his moral entitlement to live." *Spaziano v. Florida*, — U.S. —, —, 104 S.Ct. 3154, 3167, 82 L.Ed.2d 340 (1984) (Stevens, J., concurring in part and dissenting in part). For these reasons, the Eighth Amendment has been interpreted to guarantee the person whose life is at stake the right to present virtually any evidence that will show the sentencer that his humanity is important enough that it should not be denied.

> While the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative, we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment ... *requires* consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally *indispensable* part of the process of inflicting the penalty of death.
>
> This conclusion rests squarely on the predicate that the penalty of death is

qualitatively different from a sentence of imprisonment, however long.

*Woodson v. North Carolina*, 428 U.S. 280, 304–05, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (citations omitted, emphasis added). *Woodson* invalidated mandatory capital sentences because they preclude the consideration of individual circumstances that suggest the inappropriateness of death as punishment.

The Supreme Court more recently has held that a death penalty statute violates the Eighth Amendment if it limits any of the mitigating facts a capital sentencer may consider.

> Given that the imposition of death by public authority is so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is *essential* in capital cases.

*Lockett v. Ohio*, 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978) (emphasis added). *See Spaziano v. Florida*, — U.S. —, —, 104 S.Ct. 3154, 3162, 82 L.Ed.2d 340 (1984) ("The sentencer, whether judge or jury, has a constitutional *obligation* to evaluate the unique circumstances of the individual defendant....") (emphasis added).

As previously noted, I have difficulty in distinguishing between a process that denies a defendant the opportunity to present mitigating evidence and one in which, through a lawyer's mistake of judgment, such evidence is not, in fact, presented. The resulting sentence of death is equally unreliable, freakish and arbitrary.

To me, this seems true whether or not we can say that, with the omitted evidence, the result "would reasonably likely have been different." Perhaps this is why the Supreme Court has emphasized that the "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed." *Lockett v. Ohio*, 438 U.S. at 604, 98 S.Ct. at 2964. Accordingly, "unique safeguards" are required in capital sentencings. *Spaziano v. Florida*, — U.S. at

---

**3.** *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).

——, 104 S.Ct. at 3167 (Stevens, J., concurring in part and dissenting in part). Therefore, if not foreclosed by *Strickland*, I would in the present case be persuaded by Justice O'Connor's view that a capital sentence should be vacated where significant mitigating evidence has been kept from the sentencer without justification, even though the applicable death penalty statute permits its presentation, unless the mitigating evidence was "so insignificant that we can be sure its effect on the sentencing judge's [or jury's] determination was negligible." *Enmund v. Florida*, 458 U.S. 782, 801 at 830–31, 102 S.Ct. 3368, 3379 at 3394, 73 L.Ed.2d 1140 (1982) (O'Connor, J., dissenting, but agreeing that death sentence should be vacated).[4]

Were it not for *Strickland*'s (perhaps unintended) application, I would not be able to say the failures of the petitioner's lawyer were "insignificant" or their effect "negligible," and I would therefore vacate the death sentence as imposed in violation of the Eighth Amendment.

---

**4.** Never when statutes have limited the accused's presentation of mitigating evidence has the Court asked whether the omitted evidence "reasonably likely" would have produced a different result. *E.g., Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). *Strickland*, though stating that standard as governing, may possibly be distinguished in three ways. First, the issue before the Court was the Sixth Amendment, and the standard formulated is intended to govern all cases, capital and otherwise. *Strickland*'s principal concern is the reliability of a particular verdict or sentence, and, as noted in the text, the Court has been clear that "a greater degree of reliability" is called for

in capital sentencing. *Cf. United States v. Tucker*, 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972) (new sentencing where accurate information not before sentencer). Second, the sentencing in *Strickland* was by a judge, not a jury, and the record reflected a searching inquiry by the judge. Finally, the omitted evidence in issue was "insignificant" in Justice O'Connor's *Edmund* meaning in that it "would barely have altered the sentencing profile." *Strickland v. Washington*, —— U.S. at ——, 104 S.Ct. at 2071. Without Supreme Court guidance, however, we are not in a position to go where these distinctions would lead us.