Kenneth GRANVIEL,
Petitioner–Appellant,

v.

James A. LYNAUGH, Director Texas
Department of Corrections,
Respondent–Appellee.

No. 88–1818.

United States Court of Appeals,
Fifth Circuit.

Aug. 28, 1989.
Rehearing Denied Sept. 28, 1989.

Danny Burns, Fort Worth, Tex., for petitioner-appellant.

William C. Zapalac, Asst. Atty. Gen. and Jim Mattox, Atty. Gen., Austin, Tex., for respondent-appellee.

Before CLARK, Chief Judge, and WILLIAMS and GARWOOD, Circuit Judges.

CLARK, Chief Judge:

Kenneth Granviel appeals from the federal district court's denial of habeas corpus

relief from his death sentence imposed by a Texas court. We affirm.

## I.

On February 8, 1975, Kenneth Granviel confessed to the inhuman torture and murder of six women and one of the victim's two-year-old son. Seven years later in July of 1982, Granviel was indicted for one of these murders, the murder of Natasha McClendon committed in the course of aggravated rape. His trial began in March of 1983, and on May 5, 1983, the jury found Granviel guilty of capital murder. After a separate punishment proceeding before the same jury, the jury answered affirmatively the special issues needed to impose a death sentence under Texas law. Tex.Code Crim. Proc.Ann. art 37.071 (Vernon 1981). (This statute was amended after Granviel's trial. *Id.* at Supp.1989). Granviel's conviction was affirmed on appeal, 723 S.W.2d 141, and the United States Supreme Court denied certiorari in October of 1987. He was then denied collateral relief in state court. On December 7, 1987, Granviel filed his petition for writ of habeas corpus in the United States District Court of the Northern District of Texas, Fort Worth Division. After an evidentiary hearing was held on two of Granviel's claims, the district court denied the requested relief and dismissed the petition in August of 1988. This appeal followed.

Granviel raises a number of claims concerning the conduct of his trial. He also questions his present sanity. We address each claim individually.

## II.

Granviel argues that two prospective jurors, the Reverend Edgar Lincoln Curry and Pamela Norene Copeland, were improperly excused for cause on the basis of their opposition to the death penalty. *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

A prospective juror may be excused for cause on the basis of the venireperson's opposition to capital punishment only if "those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams,* 448 U.S. at 45, 100 S.Ct. at 2526. Because of the difficulty of divining a prospective juror's state of mind, particularly on a cold record, we pay deference to the trial court's factual determination that a potential juror is disqualified. The fact determination is presumed correct. *Witt,* 469 U.S. at 424–26, 105 S.Ct. at 852–53. Applying this presumption to the facts of this case, we see no grounds for disturbing the decision of the lower court. Both venirepersons in question were unequivocally opposed to the death penalty and gave inconsistent responses regarding their ability to follow the trial court's instructions. *See Ellis v. Lynaugh,* 873 F.2d 830, 832–37 (5th Cir.1989).

### A. The Reverend Edgar Lincoln Curry

At the conclusion of a long voir dire examination, the Reverend Curry stated that he did not wish to take the oath of a juror because of his opposition to the death penalty. Granviel contends that Curry was persuaded to take this position by the prosecuting attorney's suggestion that he could thereby avoid the unpleasant task of sitting in a capital case. In Granviel's view, Curry was improperly encouraged to abandon his clear statement that he would follow his oath and answer truthfully to all issues presented to him. Reviewing the transcript of the voir dire, however, we conclude that the prosecutor was properly fulfilling his duty to flush out Curry's true position.

The Reverend Curry's responses to questions make it clear that service on a death penalty case placed him in a moral dilemma. This was particularly true under the Texas procedure, which mandates a death sentence if the jury affirmatively answers three special issues or questions. The Reverend Curry strongly opposed the death penalty due to long held moral and reli-

gious beliefs and stated explicitly that he could not conscientiously participate in its imposition. These same convictions, however, also compelled him to follow his oath and answer truthfully all questions presented to him; he would not lie. Therefore, when asked if he would truthfully answer the special issues that Texas law utilizes in the penalty stage of capital cases, Curry stated unequivocally that he would answer as the evidence dictated. The dilemma created by the Texas procedure thus became apparent: assuming the facts of the case warranted the death penalty, Curry had either to answer the questions falsely or answer them as the facts dictated, and thereby sentence another to death. Curry could abide by neither result.

[by the Prosecutor]

Q. Now, earlier you said that your opinions about the death penalty were so firm that you would automatically vote against the death penalty regardless of the facts of the case?

A. Irregardless.

Q. All right.

Now, is what you're telling the judge, then, that even if you were convinced beyond a reasonable doubt, for example, that the defendant acted deliberately and there was a reasonable expectation that his actions would result in the death of another, that you might answer no to that question when in fact in your heart you knew the answer was yes?

A. Oh, no, I wouldn't do that. I wouldn't lie about it.

. . . .

Q. Now, the second question [special issue] is—we're talking about whether there's a probability he would commit criminal acts of violence? . . . . If you were convinced of that beyond a reasonable doubt, could you answer yes to that knowing that you have already answered yes to the first question and knowing that the two yes answers just—

A. Two yes answers would give him—

Q. — give him the death penalty?

A. — death penalty.

Q. Could you do that?

A. I would answer it truthfully if I was on the jury, yes.

Q. You could do that?

A. Yes.

Q. All right.

Now, here is the—the oath that you'll have to take as a juror.

. . . .

And what that oath says is that you will a true verdict render according to the law and the evidence, so help you God?

A. That's right.

Q. Okay, so if you take that oath, then you're telling—I guess what you are telling us now is that even though you're—you're adamant in your opposition of the death penalty, if you take an oath to render a true verdict, then you will render a true verdict and it won't matter to you whether death results or not?

A. I'm liable to be put in the position by telling the truth of what I have heard and what I understand that would transpire as a juror would place me in this position that I couldn't—I would have to go against what I believe, staunchly believe in, and that I would demand then that he be given capital punishment and whatever you said it was, an injection or something, lethal injection, and I don't want to be placed in that position.

From this record, the district court could properly conclude that the facially inconsistent answers of Curry did not result from any inconsistency in Curry's personal views but from the Texas death penalty procedure. Curry's position did not change during the lengthy voir dire. He and the court were made to recognize the dilemma he was being placed in and an appropriate solution was found.

B. Pamela Norene Copeland

Like the Reverend Curry, Pamela Norene Copeland was adamant in both her opposition to the death penalty and her insistence that she would answer all questions presented to her truthfully. Only

after an extensive examination by the attorneys for the prosecution and the defense, and the court did Copeland realize the contradiction in her answers. For example:

Q. [by the court] Mrs. Copeland, there's a matter that we need to clear up at this point.

You have told Mr. Wilson in response to his questions by the State in essence that your feeling about the death penalty is such that you could never serve on a jury in which you could vote for the imposition of the death penalty in any case, regardless of what the facts are; right?

A. I'm sorry. I'm getting confused now.

Q. Okay. I'm trying to unconfuse you.

You have told Mr. Wilson that you have a very strong feeling in opposition to the death penalty in any criminal case?

A. Yes.

Q. That you feeling is so strong in that regard that you could not serve on a jury and vote in such a manner that the death penalty would be imposed as a juror, regardless of what the facts are; right?

A. Right.

Q. Okay. You have now told Mr. Beatty that you could answer those two or three questions in the penalty phase of a capital murder case yes if the evidence said that you should answer them yes?

A. This was if I was on the jury.

Q. Okay.

A. I —

Q. Uh-huh. All right. Go ahead.

A. Did I just cross my answers?

Q. You sure did.

We need—you have told the State you cannot and told the defense you can, and all we need to know is which way it is?

A. Okay. If I was on, which I know—I could never say that he should die, whoever, but I could listen—this is where I thought the questions were coming from. I thought I could listen to the evidence and answer these questions yes, but when it came to the point of saying I thought he should die, I can't.

In both these cases, the prospective juror was emphatic in stating that he or she could never impose a death sentence. Nor was there any hint that they were seeking to avoid jury service. Copeland, as the mother of a nine year old son, had a statutory exemption from jury service that she declined to invoke. Any conflict in their answers resulted from the structure of questioning required by the Texas death penalty procedure. The strong opposition to the death penalty of these prospective jurors was properly found by the trial court to prevent their jury service.

### III.

During the punishment phase of the trial, the trial court refused to permit an expert witness to testify on Granviel's behalf that the death penalty does not deter crime. Granviel contends that this exclusion prevented him from presenting mitigating evidence that should have been considered by the jury. *See Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

The eighth and fourteenth amendments require that the defendant in a capital case be permitted to present for the jury's consideration during the punishment phase any mitigating evidence regarding the defendant's character, prior record, or the circumstances of the defendant's crime. *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978). However, evidence that does not bear on the defendant's character, record, or crime may properly be excluded by the trial court. *Id.* at 604 n. 12, 98 S.Ct. at 2965 n. 12; *Brock v. McCotter,* 781 F.2d 1152, 1158 (5th Cir.), *cert. denied,* 476 U.S. 1153, 106 S.Ct. 2259, 90 L.Ed.2d 704 (1986). The evidence proffered by Granviel concerning the efficacy of Texas capital statutes was irrelevant to the defendant or his crime, and therefore, the exclusion of such evidence was not constitutional error.

### IV.

Granviel raised an insanity defense at trial. In response to the defense, the state

introduced the testimony of two psychiatrists, Drs. Holbrook and Groves, who had previously examined Granviel. Dr. Holbrook originally had examined Granviel to determine his competency to stand trial on related charges and had concluded that Granviel was sane at the time of his examination. Dr. Holbrook died during the period between the first trial and the trial in issue, so his testimony was introduced through the trial transcript of the earlier trial. Dr. Groves examined Granviel when he was a juvenile. Granviel contends that the admission of the testimony of both psychiatrists violated his right against self-incrimination and to the effective assistance of counsel because he was not given *Miranda* warnings prior to the psychiatrists' examinations. *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981); *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Granviel again objected at the punishment phase of his trial. He asserted that the introduction of this evidence violated the strictures of *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866. He asked that the jury be instructed not to consider the testimony. The objection and requested instruction were denied.

## A. Granviel's Fifth Amendment Claim

■ Granviel waived any fifth amendment privilege against the introduction of the psychiatric testimony. He raised the question of his sanity. The prosecution rebutted that claim with the testimony of these examining psychiatrists. Raising an insanity defense constitutes a waiver of the defendant's protection against self-incrimination with regard to psychiatric testimony. *Buchanan v. Kentucky*, 483 U.S. 402, 107 S.Ct. 2906, 2917–18, 97 L.Ed.2d 336 (1987); *Schneider v. Lynaugh*, 835 F.2d 570, 577 (5th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 87, 102 L.Ed.2d 63 (1988). Here, as in *Buchanan*, the psychiatrists' reports were introduced to rebut the defendant's insanity defense. The psychiatrists did not reveal any admissions of the defendant concerning his crime. Therefore, the admission of their testimony, despite the fact that Granviel was not given *Miranda*

warnings prior to either examination, did not constitute a violation of Granviel's fifth amendment rights. *Buchanan*, 107 S.Ct. at 2918.

## B. Granviel's Sixth Amendment Claims

■ Unlike Granviel's fifth amendment right, his sixth amendment right to the assistance of counsel was not automatically waived by his insanity defense. *Powell v. Texas*, —— U.S. ——, ——, 109 S.Ct. 3146, 3148–50, 106 L.Ed.2d 551 (1989) (per curiam). In *Powell*, the Supreme Court clarified the distinction between a defendant's fifth and sixth amendment rights in regard to psychiatric testimony. The Court recognized the inherent inequity in permitting a defendant to raise an insanity defense while objecting to disclosure of psychiatric evaluations. The Court reasoned, however, that such inequity did not justify denying the defendant assistance of counsel during such examination. *Id.* —— U.S. at ——, 109 S.Ct. at 3148–49.

### 1. Dr. Groves

■ Granviel had no sixth amendment claims as to the admission of Dr. Grove's testimony. Dr. Groves examined Granviel in 1969, five years prior to Granviel's crime and well before adversary proceedings were initiated against him. Therefore, Granviel's sixth amendment rights had not attached, and he was not entitled to the assistance of counsel during Dr. Groves' examination. *Kirby v. Illinois*, 406 U.S. 682, 689–90, 92 S.Ct. 1877, 1882–83, 32 L.Ed.2d 411 (1972).

### 2. Dr. Holbrook

■ Dr. Holbrook was initially retained by Granviel's counsel in preparation for a trial on charges related to one of Granviel's seven other victims and while Granviel was under arrest for the present murder. Dr. Holbrook interviewed Granviel twice, on both occasions Granviel was accompanied by defense counsel. After these examinations, defense counsel petitioned the court to appoint Dr. Holbrook as a court psychiatrist, in order to have him paid by the State.

The appointment was made pursuant to article 46.02 of the Texas Code of Criminal Procedure. On the day that the appointment was requested, article 46.02 provided that the "court may at its discretion appoint disinterested qualified experts to examine the defendant with regard to his present competency to stand trial and as to his sanity...." The statute prohibits the court-appointed psychiatrist from testifying concerning statements made by the defendant. *Id.* As interpreted by the Texas Court of Criminal Appeals, this statute contemplates the appointment of a disinterested expert for the court, who will not serve as a partisan for either side. *Granviel v. State*, 552 S.W.2d 107, 115 (Tex.Crim.App. 1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977). Prior to the time of trial, the relevant statute was amended so as to require that a copy of the disinterested expert's report be furnished to the court and opposing counsel. Tex. Code of Crim.Proc. art. 46.02, § 3(d) (effective June 19, 1975). Under Texas law, an amendment to a procedural statute governs the conduct of a trial from its effective date. *Granviel*, 552 S.W.2d at 116.

Pursuant to the amended statute, the trial court ordered Dr. Holbrook to release a copy of his report to the State. Dr. Holbrook complied, over the objection of defense counsel. Counsel also objected to the use of Dr. Holbrook's report on both fifth and sixth amendment grounds prior to its use at Granviel's first trial on related charges, by motion prior to the instant trial, and during the course of the instant trial when the report was introduced and prior to the punishment phase of the trial.

Granviel's sixth amendment challenges were waived by his counsel's voluntary decision to seek to have Dr. Holbrook appointed as a disinterested qualified expert pursuant to the Texas procedure. Even under the statute's earlier formulation, the expert to be appointed was not to be a private consultant of either party. Rather, he was to be the court's disinterested expert. As such, it was proper for his opinions to be made available to either party equally. *Granviel*, 552 S.W.2d at 115. Granviel moved to have Dr. Holbrook ap-

pointed as a court expert with the advice of counsel who had been present during the doctor's examination and were thus aware of the nature and scope of the expert's examination and opinion. Granviel's counseled requests obviate any basis for objection that the availability of Dr. Holbrook's testimony might have violated his constitutional rights.

### 3. *Article 46.02*

Granviel also challenges the constitutionality of the Texas procedure requiring the disclosure of an appointed psychiatrist's report. Tex.Code Crim.Proc. art. 46.02. Prior to his trial on the instant offense, Granviel requested that the court appoint an independent expert to assist him in his defense. He specifically requested that the expert be unavailable to the prosecution or the court. The request for such confidential expert assistance was denied, although the court did appoint a disinterested expert whose report would be available to prosecution and defense alike.

Granviel alleges that the unavailability of an independent expert denied him the opportunity to meaningfully defend himself. Granviel has a fourteenth amendment right to psychiatric assistance, and the state must provide such assistance to an indigent defendant such as Granviel if the defendant's sanity is likely to be a significant factor at trial. *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). As Granviel's sanity was certainly in genuine dispute, the only remaining question is whether the Texas procedure that provides an indigent defendant with the assistance of a court-appointed psychiatrist, whose opinion and testimony is available to both sides, satisfies Granviel's rights. We hold that it does.

As the Texas Court of Criminal Appeals has noted, "A psychiatrist's examination is not an adversary proceeding. Its purpose is not to aid in the establishment of facts showing that an accused committed certain acts constituting a crime; rather its sole purpose is to enable an expert to form an opinion as to an accused's mental capacity

to form criminal intent." *Stultz v. State*, 500 S.W.2d 853, 855 (Tex.Crim.App.1973), *quoted in Granviel*, 552 S.W.2d at 115. Granviel's ability to uncover the truth concerning his sanity is not prejudiced by a court-appointed, neutral expert. Availability of a neutral expert provides defendants with "the raw materials integral to the building of an effective defense." *Ake*, 105 S.Ct. at 1093. The state is not required to permit defendants to shop around for a favorable expert. Granviel had been provided with an unbiased expert of his own choosing in the first trial and examination at the facility of his choice before the second. He does not contend that the chosen experts were incompetent. He has no right to the appointment of a psychiatrist who will reach biased or only favorable conclusions.

> [W]hen a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed, and as in the case of the provision of counsel we leave to the State the decision on how to implement this right.

*Id.* at 1096. The Texas procedure complies with the mandate of the Constitution.

## V.

■ Granviel alleges that his confession was obtained in violation of his right to counsel because the prosecutor ignored his request for counsel during his interrogation. The clear factual record before this court, however, belies that conclusion.

On February 8, 1975, hours after he murdered one of his seven victims, Granviel voluntarily entered the police station, accompanied by his pastor, and requested to speak to an officer. He orally confessed to committing seven murders and five rapes. He and two detectives then went to the apartment containing Granviel's latest victims, neither of whom was Natasha McClendon. After returning to the station, Granviel's oral confession was reduced to writing, and Granviel was asked to sign the typed confession.

It was after his voluntary oral confession and prior to signing the written confession that Granviel allegedly invoked his right to counsel. Prior to signing the statement, after having been told again of his right to have a lawyer appointed to represent him, Granviel stated that he wanted to ask a lawyer a legal question regarding the title to his car. Granviel was provided a phone book and a phone. Granviel shrugged off the phone, saying it was not important, and signed the written confession. At trial, defense counsel objected to the introduction of the confession on the ground that it was given involuntarily and without the assistance of counsel. The trial court conducted a hearing outside the presence of the jury and overruled the objection. *See Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

While the right to counsel during interrogation is an important element of an effective right against self-incrimination, Granviel's statement did not invoke the right. Granviel's statement unambiguously referred to matters unrelated to his confession and interrogation. He was apparently concerned with the disposition of his property while incarcerated, not with admitting his crime. The State is not required to provide a free attorney to answer such a request, and it does not render his confession involuntary. *See Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

## VI.

During the punishment phase of the trial, the State offered the testimony of two bailiffs. The bailiffs had observed Granviel striking his attorney during a confidential conference. Granviel argues that the

admission of such testimony violated the attorney-client privilege and rendered his counsel ineffective.

 The essence of Granviel's objection is the confidentiality of the attorney-client relationship. While incarcerated, a defendant is subject to state supervision, so attorney-client confidentiality must be jealously protected. However, Granviel's action in striking his attorney was not related to the rendering of legal representation and thus was not protected by the attorney-client privilege or the Constitution. The attorney-client privilege protects only those communications "made in confidence for the purposes of obtaining legal advice." *Wells v. Rushing*, 755 F.2d 376, 379 n. 2 (5th Cir.1985). Likewise, Granviel's right to counsel was not compromised by the revelation of an act unrelated to his defense.

## VII.

 The eighth amendment prohibition against cruel and unusual punishment condemns the execution of an insane prisoner. *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 2602, 91 L.Ed.2d 335 (1986). Accordingly, a prisoner is entitled to an adjudication of his sanity prior to execution. *Id.*, 106 S.Ct. at 2602–03. Granviel contends that he is presently insane and that the Texas procedures for determining his sanity are constitutionally defective.

 Prior to his scheduled date of execution, Granviel filed a writ of habeas corpus in the state convicting court. The state court held a hearing in which Granviel was represented by counsel, presented witnesses, and was permitted cross-examination. A psychiatrist was also appointed by the court. Although Granviel refused to respond to the psychiatrists' questions, the doctor testified that he concluded through observation alone that Granviel was sane and competent. Granviel points to no part of this procedure as defective, other than his voluntary refusal to answer questions. The state procedure constitutionally adjudicated Granviel's sanity. *See Evans v. McCotter*, 805 F.2d 1210 (5th Cir. 1986).

Granviel's rights were further protected by the federal courts. An evidentiary hearing on the issue of Granviel's present sanity was held by the federal court below. The requested relief was denied. Granviel is sane.

## VIII.

Based on the foregoing, the judgment of the district court is AFFIRMED.