**UNITED STATES COURT OF APPEALS**
**for the Fifth Circuit**

_____

No. 92-7676
Summary Calendar
_____

Johnny James,

Petitioner-Appellant,

VERSUS

James A. Collins, Director
Texas Department of Criminal Justice,
Institutional Division,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____
March 25, 1993

Before JOLLY, DUHÉ, and WIENER, Circuit Judges.

DUHÉ, Circuit Judge:

Petitioner was convicted of capital murder and sentenced to death. Having exhausted both his direct appeals and state habeas remedies, he now seeks federal relief. The district court denied Petitioner's application for the writ of habeas corpus. We affirm.

Background

After a jury trial, Petitioner was convicted of capital murder.[1] During the later sentencing phase, the jury answered affirmatively two special issues regarding (1) the deliberateness of James's actions, and (2) the probability of his future

_____

[1] The details of James's crimes are set forth in James v. State, 772 S.W.2d 84 (Tex. Crim. App. 1989).

dangerousness to society.  See Tex. Code Crim. Proc. Ann. art. 37.071(b) (West 1981).[2]  James was sentenced to death.  His conviction and sentence were affirmed by the Texas Court of Criminal Appeals.  James v. State, 772 S.W.2d 84 (Tex. Crim. App. 1989).

The United States Supreme Court granted James's petition for certiorari, vacated the judgment, and remanded the case for reconsideration in light of Penry v. Lynaugh, 492 U.S. 302 (1989). See James v. Texas, 493 U.S. 885 (1989).  The Texas Court of Criminal Appeals again affirmed Petitioner's conviction and sentence.  James v. State, 805 S.W.2d 415 (Tex. Crim. App. 1990), cert. denied, 111 S.Ct. 2915 (1991).

James then commenced his habeas attacks upon his conviction and sentence.  The state trial court entered findings of fact and conclusions of law, and the Texas Court of Criminal Appeals denied relief on the basis of these findings and conclusions.  The federal district court likewise denied Petitioner's application.  This appeal followed.

<u>Discussion</u>

Petitioner raises four issues:  First, he challenges the Texas special issues statute on the ground that it does not adequately perform the constitutionally required narrowing function, circumscribing the class of persons eligible for the death penalty.

_____

[2]  The Texas Legislature amended the capital sentencing scheme in 1991.  The amended statutes do not apply to crimes committed before the effective date of the amendments.  See Tex. Code Crim. Proc. Ann. art. 37.071 (West. Supp. 1992).

2

See Jurek v. Texas, 428 U.S. 262, 269-70 (1976); Furman v. Georgia, 408 U.S. 238, 253 (1972).  Second, it is urged that the Texas sentencing scheme precludes the sentencing jury from giving full effect to mitigating evidence presented, in violation of Penry v. Lynaugh, 492 U.S. 302 (1989).  Third, James questions the presumption of correctness which federal courts must give to state court findings of fact pursuant to 28 U.S.C § 2254(d); he contends the presumption is inapplicable here because of alleged improper participation by the state prosecutor in drafting the findings of fact.  Finally, Petitioner argues that he was unconstitutionally deprived of his right to the assistance of a mental health expert during the sentencing proceedings, in contravention of the rule announced in Ake v. Oklahoma, 470 U.S. 68 (1985).  We address each of these issues in turn.

## I.

In Furman v. Georgia, 408 U.S. 238 (1972), the Supreme Court invalidated all then-existing capital punishment statutes.  Justice Douglas, in his concurring opinion, focused upon the "uncontrolled discretion of judges or juries" in meting out the ultimate sanction: "People live or die, dependent on the whim of one man or of 12."  Id. at 253.  The legislatures of the several states heeded Furman's mandate and sought to formulate guidelines and standards to alleviate such unfettered discretion.

The Texas Legislature's response was twofold.  Initially, the narrowing function required by Furman was to be performed at the guilt-innocence phase of the capital proceeding.  See Tex. Penal

Code § 19.03 (1974) (restricting application of death penalty to intentional and knowing murders committed in five discrete situations).

In Tex. Code Crim. Proc. Ann. art. 37.071 (West 1981), the Texas Legislature bifurcated Texas capital proceedings, and provided a further narrowing mechanism. After a jury determines that a defendant is guilty of a capital offense, the same jury is presented with "special issues" which act as guides in sentencing:

> (b) On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:
>
> (1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;
>
> (2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society[.][3]

Tex. Code Crim. Proc. Ann. art. 37.071 (West 1981).[4] The state is required to prove each issue submitted beyond a reasonable doubt, and the jury may not answer "yes" to any issue unless it agrees unanimously. Id. at 37.071(c) & (d)(1). If the jury answers "yes" to each issue submitted, a sentence of death is imposed. Id. at 37.071(e).

The Supreme Court upheld the Texas capital sentencing scheme in Jurek v. Texas, 428 U.S. 262 (1976). The Jurek Court acknowledged that, "While Texas has not adopted a list of statutory

---

[3]  A third special issue, regarding killing in response to provocation, is not at issue in the instant case.

[4]  Again, this scheme is no longer used in Texas. See supra note 2.

aggravating circumstances the existence of which can justify the imposition of the death penalty ... its action in narrowing the categories of murders for which a death sentence may ever be imposed serves much the same purpose." Id. at 270.

The jurisprudence on this issue is clear. The fact that the Texas capital sentencing scheme performs the constitutionally required narrowing function at the guilt-innocence phase of the trial, with a further narrowing during the punishment phase, does not render the scheme constitutionally defective. Petitioner's arguments to the contrary are unavailing. See Graham v. Collins, 113 S.Ct. 892, 898-99 (1993) (affirming prior Fifth Circuit's en banc decision, 950 F.2d 1009 (1992)); Jurek, 428 U.S. at 270; Milton v. Procunier, 744 F.2d 1091, 1097 n.5 (5th Cir. 1984), cert. denied, 471 U.S. 1030 (1985); see also Lowenfield v. Phelps, 484 U.S. 231, 244-45 (1988) ("We see no reason why this narrowing function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase. Our opinion in Jurek v. Texas ... establishes this point." (citation omitted)).

Petitioner also argues that the Texas capital sentencing scheme was impermissibly applied in his case because the court refused to give the sentencing jury definitions for the terms "deliberately," "probability," "criminal acts of violence," and "continuing threat to society." James, citing Stringer v. Black, 112 S.Ct. 1130 (1992), characterizes these terms and phrases as impermissibly vague aggravating factors which fail to adequately channel the jury's sentencing discretion.

5

Texas, unlike Mississippi's sentencing procedure analyzed in Stringer, is not a "weighing" jurisdiction; i.e., the sentencer is not called upon to weigh mitigating evidence against a list of aggravating circumstances which the state must plead and prove. See id. at 1136. When a jury is permitted to consider a vague aggravating factor, the weighing process runs the impermissible risk of being skewed in favor of the application of the death penalty. Id. at 1137.

Despite the fact that Texas is a "non-weighing" state,[5] the terms used in the special issues are not so vague as to require clarifying instructions. When the Supreme Court upheld the Texas sentencing statutes in Jurek v. Texas, 428 U.S. 262 (1976), Justice White observed "[T]he issues posed in the sentencing proceeding have a common-sense core of meaning that criminal juries should be capable of understanding ...." Id. at 276 (White, J., concurring). In Milton v. Procunier, 744 F.2d 1091 (5th Cir. 1984), cert. denied, 471 U.S. 1030 (1985), we observed that Jurek answered the question, "at least in the abstract," that the undefined words are nevertheless capable of guiding the jury's sentencing discretion. We agree with the reasoning of Milton, which took the issue out of the realm of abstraction:

_____

[5] The relevance of this distinction is not unimportant. The Court in Stringer observed this difference is "not one of semantics, ... but of critical importance." Stringer v. Black, 112 S.Ct. at 1137. We need not explore the implications of these differences here. It is sufficient for the instant decision that the terms used in the Texas special issues are capable of being understood and applied without the aid of additional instructions.

6

> To the extent that the words strike distinct chords in individual jurors, or play to differing philosophies and attitudes, nothing more is at work than the jury system .... The answer is that such words, often of great consequence, do have a common understanding in the sense that they ultimately mean what the jury says by their verdict they mean.

Id. at 1096; accord Barnard v. Collins, 958 F.2d 634, 641 (5th Cir. 1992), cert. denied, 113 S.Ct. 990 (1993); Ellis v. Lynaugh, 873 F.2d 830, 839 (5th Cir.), cert. denied, 493 U.S. 970 (1989).

## II.

Petitioner next argues that the Texas special issues prevented the jury from giving full effect to mitigating evidence, in violation of Penry v. Lynaugh, 492 U.S. 302 (1989). During the punishment phase of his trial, James introduced evidence regarding his alcohol abuse, including intoxication at the time of the murder, and evidence that he suffered an abusive childhood. James also presented "good character evidence," consisting of evidence that he cooperated with police, showed signs of remorse over his actions, and possessed redeeming character traits.

In Penry, the Supreme Court held that mitigating evidence of the defendant's mental retardation and abusive childhood was not given full effect through the conduits of the Texas special issues statute. Absent a special instruction, Penry's sentencing jury was unable to express its "reasoned moral response" to his mitigating evidence. Id. at 328. We later construed Penry to indicate that special jury instructions must accompany the Texas special issues only when the "major mitigating thrust of the evidence is beyond the scope of all the special issues." Graham v. Collins, 950 F.2d

7

1009, 1027 (5th Cir. 1992) (en banc), aff'd 113 S.Ct. 892 (1993).

The Supreme Court, in affirming Graham, clearly demonstrated that Penry does not paint with as wide a brush as Petitioner now asserts:

> We do not read Penry as effecting a sea change in this Court's view of the constitutionality of the former Texas death penalty statute; it does not broadly suggest the invalidity of the special issues framework.... Graham indisputably was able to place all of his evidence before the jury and both of Graham's two defense lawyers vigorously urged the jury to answer "no" to the special issues based on this evidence. Most important, the jury plainly could have done so consistent with its instructions.

Graham v. Collins, 113 S.Ct. 892, 901-02 (1993) (emphasis in original). Graham was arguing that evidence of his youth and troubled familial background were not given full effect because of the Texas capital sentencing practice. Petitioner advances a similar argument with respect to his evidence of alcoholism, intoxication, abusive childhood and redeeming traits. Like Graham's contentions before him, the Texas statute did not stymie James's efforts to convey the major mitigating thrust of his evidence.

Petitioner presented testimony that he frequently abused alcohol, and that he became a "fundamentally different person" when he was inebriated. James concedes that this type of mitigating evidence can be given expression via the first special issue, which asks the jury to evaluate the deliberateness of the defendant's actions. The second special issue, regarding future dangerousness, is also animated by evidence of his alcohol problems -- but only in an aggravating fashion, Petitioner contends. James posits that

8

evidence of his alcohol abuse is a "two-edged sword;" while the jury could find that his moral culpability was diminished on account of his intoxication, the jury could as easily have concluded that James presented a continuing threat because of his propensity to overindulge. Consequently it is urged that the major mitigating thrust of this evidence is beyond the scope of the Texas special issues, and an additional instruction should have been given. James's arguments regarding evidence of his troubled upbringing are of a similar tenor.

We have visited these arguments before, and precedent undercuts Petitioner's position. In Cordova v. Collins, 953 F.2d 167, 170 (5th Cir.), cert. denied, 112 S.Ct. 959 (1992), we held that "[E]vidence of voluntary intoxication can be given full effect by the jury in deciding whether the defendant acted deliberately." Accord Kelly v. Lynaugh, 862 F.2d 1126, 1133 (5th Cir. 1988), cert. denied, 492 U.S. 925 (1989). Furthermore, James presented expert testimony that treatment plans are available for those who wish to stop abusing alcohol.[6] The sentencing jury could have reasonably

---

[6] Petitioner correctly points out that alcoholism has independent mitigating weight apart from intoxication at the time of a crime. However, James argument that he is an "alcoholic" is unfounded. There is testimony to the effect that James engaged in frequent bouts of heavy drinking; however, no expert diagnosis was presented that James in fact suffered from the disease of alcoholism. See Barnard v. Collins, 958 F.2d 634, 639 (5th Cir. 1992), cert. denied, 113 S.Ct. 990 (1993), where the Court discounted petitioner's attempts to characterize his propensity to overindulge as alcoholism:

> Nor are we convinced by Barnard's efforts to characterize the record as raising an issue of an addictive disorder. The scattered testimony recounting Barnard's evidently frequent episodes of heavy alcohol consumption, alcohol

9

taken this into consideration when evaluating whether or not James would continue to be a threat to civilized society.

Likewise, no special instruction is necessary to effectuate evidence presented on Petitioner's impoverished and abusive family history. James presented evidence that he and his siblings were abused by their alcoholic father, and occasionally deprived of food. Later, after the death of his mother, James went to live with his father, who apparently was less than a desirable role model for his teenage son. Such evidence can be given effect by the Texas statutory sentencing scheme even without resorting to additional instructions. See Graham v. Collins, 113 S.Ct. 892, 902 (1993); Barnard v. Collins, 958 F.2d 634, 639 (5th Cir. 1992), cert. denied, 113 S.Ct. 990 (1993).

Finally, the evidence that James possessed some redeeming character traits is also adequately addressed by the use of the Texas sentencing scheme. There was testimony that Petitioner showed signs of remorse for his actions, that he cooperated with the police investigation, and that he had developed positive familial ties despite his own troubled upbringing. We are unpersuaded that the major mitigating thrust of this evidence went beyond the special issues. Such positive character evidence is directly related to whether or not James would continue to present a threat to society, and an additional instruction to that effect is not required. See Graham, 113 S.Ct. at 902; Barnard, 958 F.2d

---

intoxication and marijuana use does not demonstrate that the episodes were attributable to a permanent handicap.

10

at 638-39; Wilkerson v. Collins, 950 F.2d 1054, 1061-62 (5th Cir. 1992).

### III.

Petitioner next argues that the district court erred in affording the statutory presumption of correctness to the findings of fact by the state court. See 28 U.S.C. § 2254(d) (1977). It is argued that the findings resulted from an ex parte collaboration between the state trial court and the state prosecutor. Accordingly, James continues, these findings were developed in contravention of basic principals of due process.

Section 2254(d) requires that a federal district court accept as correct the findings of a state court which are "evidenced by a written finding, written opinion, or other reliable and adequate written indicia" and issued "after a hearing on the merits of a factual issue." Id. A full-blown trial type hearing is not necessary to satisfy § 2254. In May v. Collins, 955 F.2d 299, 310 (5th Cir.), cert. denied, 112 S.Ct. 1925 (1992), we held that findings entered after a "paper hearing" in the state court were entitled to § 2254(d)'s presumption of correctness.[7] This presumption is further strengthened if the same judge that issues

_____

[7] See also Sumner v. Mata, 449 U.S. 539, 546-47 (1981), where the Court commented on the application of § 2254(d):

> Nor does it specify any procedural requirements that must be satisfied for there to be a 'hearing on the merits of a factual issue,' other than that the habeas applicant and the State or its agent be parties to the state proceeding and the state-court determination be evidenced by a 'written finding, written opinion, or other reliable and adequate written indicia.'

11

the written findings also presided at Petitioner's trial.  Id. at 314; Buxton v. Lynaugh, 879 F.2d 140, 146 (5th Cir. 1989), cert. denied, 497 U.S. 1032 (1990).  Such was the case here, where the state judge before whom James's trial was conducted also heard his application for habeas relief.

While Petitioner argues at length that the fact finding process was inherently biased because of the state's participation, he does not seriously contest the correctness of the majority of the findings.  James points out that the district court adopted the state court's finding that he was not a "chronic alcoholic," and argues that this determination was the product of the inadequate fact-finding process of the state court.  We disagree.  There was never any medical testimony that James in fact was an alcoholic, chronic or otherwise.  Petitioner presented testimony from Dr. Fred Lanier Fason, a psychiatrist with experience in treating alcoholism.  Fason testified on the impact that alcohol consumption has on a person's ability to reason and deliberate.  See R. vol. 28, at 5961-67.  Fason never conducted an individual examination of James, and never testified that James was an alcoholic.  We agree with the reasoning of the Court in Barnard v. Collins, 958 F.2d 634 (5th Cir. 1992), cert. denied, 113 S.Ct. 990 (1993), that "scattered testimony recounting [Petitioner's] evidently frequent episodes of heavy alcohol consumption [and] alcohol intoxication ... does not demonstrate that the episodes were attributable to a

12

permanent handicap."  Id. at 639.[8]

During his state court habeas proceedings, James submitted a lengthy, detailed application for relief.  The state court twice extended its own deadline for rendering a decision.  We agree with the observation of the district court that "it can be assumed that the judge reviewed the submissions of both parties, reviewed the record of the underlying trial, and reflected upon his own impressions and firsthand knowledge of the events that took place at trial."  R. vol. 1, at 564-65 (unpublished opinion of district court).

In the federal district court, James moved the district court to reject the state court's findings.  The district court noted that this motion was "exhaustive," and fully supported by memorandum and "supplemented by numerous affidavits from accomplished law professors."  The district court carefully evaluated James's motion before reaching the merits of his habeas claims, and concluded that there was no evidence of prosecutorial

---

[8]  Petitioner also cites as error the district court's verbatim adoption of five state court findings of fact.  These factual conclusions all dealt with jury selection.  This is clearly an area where the state court judge, before whom the actual trial was conducted, "was in a different and better position to make determinations regarding the facts and circumstances surrounding that trial than other courts on direct or collateral review." Buxton v. Lynaugh, 879 F.2d 140, 146 (5th Cir. 1989), cert. denied, 497 U.S. 1032 (1990).  Again, while James contests the procedures used to develop the state court's findings of fact, he does not argue that they are, in the aggregate, incorrect.  We are unpersuaded that § 2254(d)'s presumption is inapplicable.  Cf. Rushen v. Spain, 464 U.S. 114, 120 (1983) (§ 2254(d) accords a "high measure of deference" to state court's findings of fact, and they "may be set aside only if they lack even fair support in the record."  (internal citations omitted)).

13

misconduct.

Petitioner was afforded adequate opportunity to participate in the development of the fact findings, and we cannot say that any of the statutory exceptions to § 2254(d)'s presumption of correctness are applicable. See 28 U.S.C. § 2254(d)(1)-(8). The district court properly deferred to the findings of the state court. See Rushen v. Spain, 464 U.S. 114, 120 (1983); Sumner v. Mata, 449 U.S. 539, 546-47 (1981); May v. Collins, 955 F.2d 299, 310 (5th Cir.), cert. denied, 112 S.Ct. 1925 (1992); Buxton v. Lynaugh, 879 F.2d 140, 146 (5th Cir. 1989), cert. denied, 497 U.S. 1032 (1990).[9]

IV.

In his final point of error, James argues that he was unconstitutionally compelled to surrender his right to assistance from a mental health expert. As a result of being forced to forego the development of this type of evidence, Petitioner claims he was also deprived of the effective assistance of counsel.

Petitioner cites Tex. Crim. Code Proc. Ann. art. 46.03 § 3 (West 1988), for the proposition that had he requested that the court appoint a psychiatrist to assist him in the punishment phase of his trial, any report prepared by the examining psychiatrist would have been discoverable by the state. James argues that such a result violated his constitutional rights in two ways: (1)

---

[9] Additionally, with the possible exception of his Penry claim regarding "chronic alcoholism," Petitioner's habeas claims are all without legal support, and do not depend on the facts as developed by the state court. With respect to James' contention that he was a chronic alcoholic, our review of the record reveals that he offered no testimony which would support this fact.

14

Compelling a defendant to choose between constitutional rights is itself unlawful;[10] and, (2) by requiring that the results of his mental examination be turned over to the State, the Texas Criminal Code inhibited James's counsel from fully evaluating all relevant evidence.

We need not reach the ineffective assistance of counsel issue because James's initial reliance on Tex. Code Crim. Proc. Ann. art. 46.03 § 3 is misplaced. This provision addresses situations where a defendant has raised an insanity defense at the guilt-innocence phase of the trial, and does not speak to appointment of expert assistance for the punishment phase of the proceedings.[11] We will not engage in speculation about what may have transpired if such a request had been made. Accordingly, we affirm the decision of the district court on this issue.

Conclusion

For the foregoing reasons, the district court's order denying the petition for a writ of habeas corpus is AFFIRMED, and James's request that we stay his sentence of execution is DENIED.

---

[10] The competing rights James alleges he was forced to chose between were 5th Amendment protections against self-incrimination, and the right to have court-appointed psychiatric assistance for an indigent defendant, per Ake v. Oklahoma, 470 U.S. 68 (1985).

[11] Likewise, Petitioner's citation of Granviel v. Lynaugh, 881 F.2d 185 (5th Cir. 1989), cert. denied, 495 U.S. 963 (1990), is also misplaced. Granviel involved the defendant's raising his sanity as an issue at the guilt-innocence stage of trial. Id. at 190-91.