**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 12, 2012

No. 11-70016

Lyle W. Cayce
Clerk

ROBERT WAYNE HARRIS,

Petitioner - Appellant

v.

RICK THALER, Director, Texas Department of Criminal Justice,
Correctional Institutions Division,

Respondent - Appellee

Appeal from the United States District Court
for the Northern District of Texas
(05-CV-243)

Before DAVIS, SMITH and SOUTHWICK, Circuit Judges.

PER CURIAM:[*]

Robert Wayne Harris was convicted of capital murder following a jury trial
in Texas and sentenced to death. The Texas Court of Criminal Appeals (CCA)
affirmed his conviction and sentence on direct appeal. Harris unsuccessfully
sought both state and federal habeas relief. Harris now seeks a certificate of
appealability (COA) pursuant to 28 U.S.C. § 2253 to challenge the district court's
denial of habeas relief, arguing under *Atkins v. Virginia*, 536 U.S. 304 (2002),
that he cannot be executed because he is mentally retarded. We hold that

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

No. 11-70016

reasonable jurists could not debate the district court's conclusion that Harris has failed to show that he is ineligible for a death sentence under *Atkins*. Accordingly, we deny his request for a COA.

I.

The CCA summarized the facts of Harris's crime in its opinion on direct appeal:

> [Harris] worked at Mi-T-Fine Car Wash for ten months prior to the offense. An armored car picked up cash receipts from the car wash every day except Sunday. Therefore, [Harris] knew that on Monday morning, the safe would contain cash receipts from the weekend and the cash register would contain $200-$300 for making change. On Wednesday, March 15, 2000, [Harris] masturbated in front of a female customer. The customer reported the incident to a manager, and a cashier called the police. [Harris] was arrested and fired.
>
> On Sunday, March 19[th], [Harris] spent the day with his friend, Junior Herrera, who sold cars. Herrera was driving a demonstrator car from the lot. Although [Harris] owned his own vehicle, he borrowed Herrera's that evening. He then went to the home of friend Billy Brooks, who contacted his step-son, Deon Bell, to lend [Harris] a pistol.
>
> On Monday, March 20[th], [Harris] returned to the car wash in the borrowed car at 7:15 a.m., before it opened for business. [Harris] forced the manager, Dennis Lee, assistant manager, Agustin Villaseñor, and cashier, Rhoda Wheeler, into the office. He instructed Wheeler to open the safe, which contained the cash receipts from the weekend. Wheeler complied and gave him the cash. [Harris] then forced all three victims to the floor and shot each of them in the back of the head at close range. He also slit Lee's throat.
>
> Before [Harris] could leave, three other employees arrived for work unaware of the danger. [Harris] forced them to kneel on the floor of the lobby area and shot each of them in the back of the head from close range. One of the victims survived with permanent disabilities. Shortly thereafter, a seventh employee, Jason Shields, arrived. Shields noticed the three bodies in the lobby and saw [Harris]

No. 11-70016

standing near the cash register. After a brief exchange in which [Harris] claimed to have discovered the crime scene, pointed out the bodies of the other victims, and pulled a knife from a nearby bookshelf, Shields became nervous and told [Harris] he needed to step outside for fresh air. Shields hurried to a nearby doughnut shop to call authorities. [Harris] followed Shields to the doughnut shop, also spoke to the 911 operator, then fled the scene.

[Harris] returned the vehicle to Herrera and told him that he had discovered some bodies at the car wash. [Harris] then took a taxi to Brooks's house. At Brooks's house, he separated the money from the other objects and disposed of the metal lock boxes, a knife, a crowbar, and pieces of a cell phone in a wooded area. [Harris] purchased new clothing, checked into a motel, and sent Brooks to purchase a gold cross necklace for him. Later that afternoon, [Harris] drove to the home of another friend and remained there until the following morning, when he was arrested. Testimony also showed that [Harris] had planned to drive to Florida on Tuesday and kill an old girlfriend.

Harris v. State, Slip. Op. at *2, 2003 WL 1793023. Harris was convicted of capital murder for killing Agustin Villaseñor and Rhoda Wheeler in the same criminal transaction and sentenced to death. The CCA affirmed. *Harris v. State*, 2003 WL 1793023 (Tex. Crim. App. 2003)(unpublished). The Supreme Court denied certiorari review. *Harris v. Texas*, 540 U.S. 839 (2003).

Harris petitioned the state court for a writ of habeas corpus, raising an *Atkins* claim among others. After finding that there were no factual issues requiring a hearing, the trial court entered detailed findings of fact and conclusions of law recommending that habeas relief be denied based on its review of the trial and habeas record. The trial court found that the only time Harris's IQ was tested below 70 was at the age of twenty-eight while preparing his defense to the capital murder charge, and that prior to age eighteen, Harris's IQ was tested at 71 and 80. The trial court concluded that Harris failed to present proof that he met the "significantly subaverage intellectual function"

and "onset during developmental phase" prongs of the test for mental retardation. Further it made detailed and extensive findings of fact regarding Harris's adaptive function based on the records, trial proceedings, and Harris' behavior regarding the offense. The trial court concluded that Harris was not mentally retarded. The CCA expressly adopted the trial court's findings and denied Harris's application for writ of habeas corpus. *Ex parte Harris*, No. 59,925-01 (Tex. Crim. App. Sept. 15, 2004). Harris did not petition the Supreme Court for review of that decision.

Harris filed a federal writ application. The district court approved funds for the appointment of an investigator and for a mental retardation expert. The Director's motion for discovery of Harris's medical and school records was also granted. In August 2008, the district court granted Harris's request for an evidentiary hearing on his mental retardation claim. After the hearing date was set, it was continued at Harris's request. When Harris again requested a continuance of the hearing, the district court ordered a hearing on the issue. Following the hearing, the magistrate judge ordered Harris to submit itemized statements and a status report from the psychologist and investigator. The evidentiary hearing was reset.

Five days before the evidentiary hearing was to take place, Harris moved to cancel his evidentiary hearing and supplement the record with documentary evidence. The request was granted but Harris failed to supplement the record with any evidence. He did file an affidavit of counsel that his expert had retired and was unavailable. Harris also filed his psychologist's affidavit confirming that he did not want to testify. Harris then moved for funding to hire a different expert and for an evidentiary hearing. The magistrate judge denied the request and instead ordered the appointment of an expert to conduct an independent evaluation for the court. Dr. Andrews was appointed and submitted his report to the court.

No. 11-70016

After reviewing the record, the district court found that Harris failed to show by clear and convincing evidence that he is mentally retarded and denied Harris's petition and COA. This appeal followed.

## II.

Under AEDPA, a petitioner must obtain a COA before he can appeal the district court's denial of habeas relief. See 28 U.S.C. § 2253(c); see also *Miller-El v. Cockrell*, 537 U.S. 322, 335-36, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) ("[U]ntil a COA has been issued federal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners."). As the Supreme Court has explained:

> The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits. We look to the District Court's application of AEDPA to petitioner's constitutional claims and ask whether that resolution was debatable among jurists of reason. This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims. In fact, the statute forbids it.

*Miller-El*, 537 U.S. at 336.

COA will be granted only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327 (citation omitted). "The question is the debatability of the underlying constitutional claim, not the resolution of that debate." *Id*. at 342. "Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id*. at 338. Moreover, "[b]ecause the present case involves the death penalty, any doubts as to whether

No. 11-70016

a COA should issue must be resolved in [petitioner's] favor." *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000) (citation omitted).

Pursuant to the federal habeas statute, as amended by AEDPA, we defer to a state court's adjudication of a petitioner's claims on the merits unless the state court's decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court's decision is deemed contrary to clearly established federal law if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court based on materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 404-08, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). A state court's decision constitutes an unreasonable application of clearly established federal law if it is "objectively unreasonable." *Id.* at 409. Further, pursuant to § 2254(e)(1), state court findings of fact are presumed to be correct, and the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. See *Valdez v. Cockrell*, 274 F.3d 941, 947 (5th Cir. 2001).

III.

Harris argues that COA should issue on the question of whether he is mentally retarded and thus exempt from the death penalty under *Atkins*. Harris raises several arguments in support of his application for COA: (1) that the state court erred in denying a live evidentiary hearing on his *Atkins* claims; (2) that the state and federal courts erred in considering expert testimony that did not adjust Harris's IQ scores using Standard Error of Measurement or the Flynn Effect; (3) that the federal court erred in granting Harris' motion to cancel the

evidentiary hearing; and (4) that the district court erred in concluding that the state court reasonably rejected Harris's claim that he is mentally retarded.

## (1) that the state court erred in denying a live evidentiary hearing on his *Atkins* claims.

The district court recognized that at least some of these issues were governed by this circuit's decision in *Hall v. Quarterman*, 534 F.3d 365 (5th Cir. 2008). In *Hall*, the petitioner was convicted of capital murder prior to the Supreme Court's decision in *Atkins*. Evidence of Hall's mental abilities was presented at the trial in mitigation. On direct appeal the Texas Court of Criminal appeals rejected Hall's claim that the Constitution barred the execution of mentally retarded persons. Hall filed a state habeas petition requesting a full and fair hearing of this claim, arguing that there had been no fact finding by the trial court or jury as to whether he was, in fact, mentally retarded. While his state habeas claim was pending, the Supreme Court decided *Atkins*. Hall re-urged his claim for a live hearing on the mental retardation issue. The trial court rejected this claim and conducted a hearing by affidavit, ultimately denying his claim.

The Supreme Court granted Hall's petition for certiorari from his direct appeal and vacated and remanded to the CCA to reconsider its affirmance in light of *Atkins*. The CCA, relying on the record, held that Hall was not mentally retarded. Hall again appealed to the Supreme Court which denied certiorari. Hall then filed a federal habeas petition.

Because *Atkins* was decided after Hall's conviction, and the state habeas court's paper hearing on the *Atkins* mental retardation issue was completed before Texas defined mental retardation under *Atkins* in *Briseno*,[1] this court held that Hall never had the opportunity to present the full range of evidence on the

---

[1] *Ex Parte Briseno*, 135 S.W.3d 1 (Tex. Crim App. 2004).

technical question of whether he was mentally retarded. In addition, the state trial court's decision included some factual errors. This court found that the district court abused its discretion by denying Hall a meaningful hearing on the question because, as a result of the process below and the timing of critical decisions from the Supreme Court and the Texas Court of Criminal Appeals, Hall's claim had a high risk of error in fact finding. On remand, the district court conducted an evidentiary hearing and found that Hall was not mentally retarded. *Hall v. Thaler*, 597 F.3d 746 (5th Cir. 2010). This court noted that the district court on remand properly gave deference to the state court's determinations on factual issues, under 28 U.S.C. § 2254(e)(1), under which the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. The district court also found as an original matter that Hall was not mentally retarded. *Hall*, 597 F.3d at 747, Higginbotham concurring.

In this case, Harris like Hall was tried and convicted prior to the Supreme Court's decision in *Atkins.* Also like Hall, Harris filed his state habeas petition prior to the Texas Court of Criminal Appeals' decision in *Briseno,* and the state habeas court signed its original findings of fact and conclusions of law before *Briseno* issued.[2] Also, the question of whether Harris was mentally retarded was decided by the state trial court in a paper hearing. Accordingly, in order to avoid the potential for factual errors recognized in *Hall*, the district court in this case granted Harris's request for the live hearing. After Harris elected to waive the evidentiary hearing, the district court reviewed the record and gave deference to the state court's determination of factual issues. However it also made an independent finding that Harris was not mentally retarded.

---

[2] The state habeas court apparently signed its original findings of fact and conclusions of law in June 2003, before *Briseno* was decided, but the original was lost and a substitute version was formally signed on August 10, 2004.

No. 11-70016

The facts in this case are indistinguishable from those in *Hall*. Based on that precedent, which did not remand for a hearing in the state habeas court, Harris's claim arising from the lack of a live hearing in this case cannot entitle him to relief because jurists of reason would not disagree with the district court's resolution of this claim. In addition, under *Hall*, the lack of a live hearing in the state habeas court does not negate the presumption of correctness accorded to factual decisions made by that court. *Id.* at 746, n.2. Harris's ultimate burden was to rebut the presumption of correctness by clear and convincing evidence, as will be discussed in issue (4). *Id.*

**(2)   that the state and federal courts erred in considering expert testimony that did not adjust Harris's IQ scores using Standard Error of Measurement or the Flynn Effect.**

We next consider Harris's argument related to Standard Error of Measurement and the Flynn Effect. According to American Association of Intellectual and Developmental Disabilities (AAIDD), the standard margin of error of measurement on standardized tests measuring general intellectual functioning is 3 to 5 points. The Flynn Effect is an adjustment used in interpreting standardized tests to account for the fact that IQ scores have been increasing from one generation to the next and calls for a reduction of approximately 0.33 points per year for each year between the time the test was administered and the test was normed.

The Texas Court of Criminal Appeals has declined to apply the Flynn Effect to mental retardation claims, referring to it as "an unexamined scientific concept that does not provide a reliable basis for concluding that an appellant had significant[ly] subaverage general intellectual functioning." *Neal v. State*, 256 S.W. 3d 254, 273 (Tex. Crim. App. 2008); *Ex parte Blue*, 230 S.W.3d 151, 166 (Tex. Crim. App. 2007). Because the Supreme Court in *Atkins* left to the states the task of defining mental retardation, the Texas court's approach to this aspect

9

of the definition of mental retardation is not contrary to, or an unreasonable application of, clearly established federal law.  In addition, this circuit does not recognize the Flynn Effect as a valid scientific theory.  *In re Mathis*, 483 F.3d 395, 398, n.1 (5th Cir. 2007).  No clearly established federal law requires that a state or federal court only accept IQ scores adjusted by the Flynn Effect or the Standard Error of Measurement.  Finally, Harris did not raise the issue of the Flynn Effect or the Standard Error of Measurement in the district court until his Motion to Alter or Amend the Judgment and did not raise the issues at all before the state court.  Accordingly, neither theory can justify relief.  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398-99 (2011).

**(3) that the federal court erred in granting Harris' motion to cancel the evidentiary hearing**.

As outlined above, it was Harris's decision to waive the evidentiary hearing and present his case of mental retardation to the district court in writing.  As the district court noted, Harris waived the hearing because the expert he hired returned an unfavorable opinion and Harris's request for additional funding for a different expert was refused.  No clearly established federal law requires the district court to hold a hearing over petitioner's objection.  Further no federal law gives Harris the right to an additional expert. *Ake v. Oklahoma*, 470 U.S. 68, 83 (1986) (defendant is not entitled to an expert "of his personal liking"); *Glass v. Blackman*, 791 F.2d 1165, 1168-69 (5th Cir. 1986) (suggesting that *Ake* does not require that more than one expert be provided); *Granviel v. Lynaugh*, 881 F.2d 185, 192 (5th Cir. 1989)(holding that *Ake* does not give a defendant the "right to the appointment of a psychiatrist who will reached biased or only favorable conclusions").  This claim is without merit as Harris does not make a substantial showing of the denial of a constitutional right.

No. 11-70016

**(4) that the district court erred in concluding that the state court reasonably rejected Harris's claim that he is mentally retarded**.

At the core of Harris's petition for COA is his position that the state and federal habeas courts erred in concluding that he is not mentally retarded. Texas courts have defined mental retardation as (1) significant subaverage general intellectual functioning, meaning an IQ of about 70 or below; (2) accompanied by related limitations in adaptive functioning; and (3) the onset of which occurs prior to the age of 18. *Briseno*, 135 S.W. 3d at 7; *Lewis v. Quarterman*, 541 F.3d 280, 283 (5th Cir. 2008). Failure of any of the elements defeats a claim of mental retardation. In order to grant habeas relief, the federal habeas court must determine that all of the adverse findings on the three elements of mental retardation by the state court were based upon an unreasonable determination of the facts in light of all the evidence. *Lewis*, 541 F.3d at 286. Based on our review of the record, Harris has not met this standard.

As summarized by the district court,

> Harris has tendered documents and exhibits in support of his claim that he is mentally retarded and exempt from execution under *Atkins*, including affidavits from lay witnesses, a neuropsychological evaluation by Dr. C. Munro Cullum, and the trial testimony of Dr. Mary Connell. The pre-Atkins expert opinions of Dr. Cullum, Dr. Douglas Crowder, and Dr. Connell suggested that Harris was in the borderline intellectual range that may have included mild mental retardation, but none of them testified that Harris qualified as mentally retarded. The State identified at least six intelligence test scores above the range of mental retardation, and submitted expert reports from Dr. Thomas Allen and Dr. Richard Hughes. Dr. Allen offers the opinion that Harris is not mentally retarded under Atkins, and Dr. Hughes provides an evaluation of the school records with the opinion that Harris did not function as mentally retarded within the developmental period (prior to age 18).

No. 11-70016

In short, Harris has offered no expert opinion that he is mentally retarded and no I.Q. score at 70 or below from a test taken prior to age 18.

In addition the state court referred to its own memory of the trial record which included many examples of Harris's ability to function normally in society, in support of its conclusion that Harris does not suffer from significant adaptive deficits. Harris earned As, Bs and Cs in school (except for getting Ds and Fs in first grade, and failing third grade) and earned his GED at age eighteen. Harris had his own apartment, a driver's license, a girlfriend, a roommate, a car, a checking account, and friends. At the age of ten, Harris started his own lawn care business and created business cards for that purpose. He performed a wide range of odd jobs for money and the state court noted that Harris worked for ten months at the car wash before murdering his co-workers. Harris understood how money orders worked, because he used some of the crime proceeds to buy one intended to pay a debt. The state court also found that Harris had "at least" an average ability to read and write, based on his handwritten confessions and correspondence. Harris was also able to construct a somewhat elaborate statement regarding the capital murders, a contraindication of mental retardation and the follower mindset ascribed to that condition. Based on this evidence, the state court reasonably found that Harris had failed to establish related adaptive deficits.

Accordingly, Harris has not met his burden of rebutting by clear and convincing evidence the presumption of correctness that attaches to the state habeas court's finding that he is not mentally retarded. See *Valdez v. Cockrell*, 274 F.3d 941, 947 (5th Cir. 2001).

IV.

For the foregoing reasons, Harris's application for COA is DENIED.