IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 02-10258

BRUCE CHARLES JACOBS,

Petitioner-Appellant,

versus

JANIE COCKRELL, Director, Texas Department of Criminal Justice, Institutional Division,

Respondent-Appellee.

Appeal from the United States District Court
for the Northern District of Texas
(3:97-CV-2728-M)

October 29, 2002

Before DAVIS, BENAVIDES, and CLEMENT, Circuit Judges.

PER CURIAM:[*]

Petitioner, sentenced to death for capital murder, applies to this Court for a certificate of

appealability (COA) so that we may address the merits of his appeal from the district court's denial

of his habeas corpus petition. Finding that petitioner has failed to make a substantial showing that he

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

was denied any constitutional rights, the application is denied.

## I. FACTS AND PROCEEDINGS

A jury found Bruce Jacobs guilty of murdering 16-year-old Conrad Harris, who was stabbed with a butcher knife 24 to 26 times in the bedroom of his Dallas home on the morning of July 22, 1986. Conrad's father, Hugh Harris, and his stepmother, Holly Kuper, were awakened at around 6:45 a.m. by Conrad's screams. Harris ran into Conrad's bedroom to find a man with a butcher knife standing before him, and Conrad on the floor bleeding. The assailant fled. Kuper noticed that the back screen door had been ripped, and that the contents of her purse had been dumped out. A $100 bill was missing from her purse. She also noticed a dinner knife sitting out in the kitchen that had not been there the night before. Harris described the assailant to police as a bearded, muscular man, wearing a tank top and Panama hat.

The day before the murder, Kuper had answered a knock at the front door from a similar-looking man asking for directions. The man re-appeared later in the day, and tried to force his way into the back door. Kuper managed to lock the back door before he could get in, and she called the police. Kuper and Harris independently made composite drawings for the police on the day of the murder.

Publicity of the murder produced several witnesses who saw a man fitting the assailant's general description near Harris and Kuper's home on the morning of the murder. In the same area and around the same time as the murder, Alexander Wensowitch saw a man wearing a Panama hat who "almost broke into a run" upon hearing police sirens. Soon after and also near the murder scene, Kay Harp saw a man holding a hat in his hand run towards a cab and get in. Harp happened to know the cab driver's wife, and police were able to locate the driver. Zerai Haile testified that on the morning of the murder, he drove a bearded man wearing a hat to Tenth and Tyler streets in South Oak Cliff.

2

Police drove Haile along the route he drove the morning of the murder, and Haile noticed a man wearing a Panama hat and fitting the general physical description of the passenger— except without the beard —walking down the street near the passenger's destination on the morning of the murder. After following him for a short while, police arrested the man, petitioner Bruce Jacobs. They found bloody clothes and beard hair fibers in his home, and his fingerprints matched prints lifted from the dinner knife found in Harris and Kuper's kitchen. At trial, Harris and Kuper positively identified Jacobs as the man who came to their home on the day before and the morning of the murder. The jury found Jacobs guilty of capital murder and sentenced him to death.

Jacobs' conviction and sentence were upheld in state appeals and collateral proceedings, and a federal district court denied his petition for a writ of habeas corpus. He now applies to this Court for a COA, so that he may appeal the merits of the denial of his federal habeas petition.

## II. STANDARD OF REVIEW

Before appealing a federal district court's denial of a petition for a writ of habeas corpus, a state prisoner must obtain a COA, which is issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Supreme Court has held that this language requires the prisoner to show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). It follows that we must consider petitioner's arguments "through the lens of the deferential scheme" that the district court applied under § 2254 in rejecting petitioner's application for a writ of habeas corpus. *Barrientes v. Johnson*, 221 F.3d 741, 772 (5th Cir. 2000). Under § 2254(d), a federal court reviewing a habeas petition must defer to a state court's decision on an issue

3

unless it is "contrary to, or involve[s] an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or... [is] based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254 (d)(1) & (2). A state court's factual determinations "shall be presumed to be correct," and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." § 2254 (e)(1).

### III. ANALYSIS

A. Issues Relating to the State Habeas Proceedings

    1. Whether Jacobs' state habeas petition received meaningful review

Jacobs argues that during state habeas proceedings, he never received the state's proposed findings of fact and conclusions of law, and that the judge signed those findings verbatim, without even reading Jacobs' 200-page petition. These facts prove, according to Jacobs, that he was denied meaningful state habeas review.

Even if we agreed with all of Jacob's assertions, deficiencies in state habeas proceedings provide no grounds for relief in federal court. *See Trevino v. Johnson*, 168 F.3d 173, 180 (5th Cir. 1999) (no federal habeas relief where the state habeas court adopted the district court's proposed findings of fact and conclusions of law only three hours after they were filed). "An attack on a state habeas proceeding does not entitle the petitioner to habeas relief in respect to his conviction, as it 'is an attack on a proceeding collateral to the detention and not the detention itself.'" *Nichols v. Scott*, 69 F.3d 1255, 1275 (5th Cir. 1995) (citation omitted). This result is unsurprising because the Constitution does not require states to provide criminal defendants with any collateral proceedings. *Murray v. Giarratano*, 492 U.S. 1, 10 (1989).

4

## 2. Whether state habeas fact-finding is entitled to deference

Jacobs argues that because there was no meaningful review, the general rule that state fact-finding be presumed correct unless proved otherwise by clear and convincing evidence, s*ee* 28 U.S.C. § 2254(e)(1), should not apply to the habeas findings. We note first that Jacobs' evidence that his habeas petition went unread—that the file appeared undisturbed two weeks before the order was signed—is questionable. However, we need not decide how the alleged procedural irregularities, if true, would impact our deference to the state habeas fact-finding because the jury and direct appeal fact-finding is more than sufficient to dispose of Jacobs' claims. Jacobs has not identified any particular state habeas finding as erroneous, nor has he explained how that determination would aid his petition. Nevertheless, nothing in this appeal relies on the state habeas findings.

## B. Jury Instructions

The jury answered "yes" to the following questions, or "special issues," mandating a death sentence under then-applicable Texas law, *see* TEX. CRIM. PROC. CODE ANN. § 37.071 (Vernon 1987):

> Do you find from the evidence beyond a reasonable doubt that the conduct of the defendant, Bruce Charles Jacobs, that caused the death of the deceased, Conrad Harris, was committed deliberately and with the reasonable expectation that the death of the deceased would result? [the "deliberateness" special issue]

> Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Bruce Charles Jacobs, would commit criminal acts of violence that would constitute a continuing threat to society? [the "future dangerousness" special issue]

## 1. Whether the instructions prevented consideration of mitigating evidence

Jacobs argues that, as in *Penry v. Lynaugh*, 492 U.S. 302 (1989), the jury was unconstitutionally prevented from giving effect to mitigating evidence. He also argues that expert affidavits prove that

the failure of the jury instruction to mention or define "mitigating evidence" created a reasonable likelihood that jurors would erroneously believe they could not consider mitigating evidence in violation of *Boyde v. California,* 494 U.S. 370 (1990).

(a) Applicable facts

Three witness testified on Jacobs' behalf at the sentencing phase. Dorothy Crawford, Jacobs' landlord, testified that he was a good tenant. Neighbor Ena Crawford testified that he was nice to her and occasionally picked up groceries for her— in fact, she said Jacobs was picking up a loaf of bread for her when he was arrested. An acquaintance, Lupe Torres, testified that he had a good reputation in the community as a peaceful and law-abiding citizen. There was no evidence that Jacobs had been arrested in the 14 years prior to the murder, and there was evidence that he had been employed as a dishwasher.

Fourteen witnesses testified at the sentencing phase on the prosecution's behalf, producing the following evidence. In 1963 Jacobs, then 16, stabbed a 12-year-old girl and was sent to a Texas juvenile facility until 1966. Jacobs' caseworker at the facility testified that Jacobs had an "explosive temper" and had to be sent to the maximum security unit several times. In 1967, Jacobs, then 21, assaulted and attempted to rob an Oregon high school student with a razorblade. He was imprisoned in Oregon until 1972.

Jacobs' aunt, Shirley Reynolds, testified that he called her the day after the murder and said he was thinking of moving to Houston, and that he tried to break into her house the following day. Legal secretary Robbie Hill testified that Jacobs had made frightening sexual advances towards her on a couple of occasions. Debbie Palmer, a former co-worker, testified that he was menacing and forward towards female co-workers. Mary Blann, Jacob's former manager, testified that Jacobs bragged at

6

work that he had burglarized houses, and that she fired Jacobs five days before the murder for threatening a co-worker. Another former co-worker, Beverly Wilson, testified that Jacobs threatened to kill her. Teri Hermann, a zoo employee, testified that on the same day her name and photo appeared in a Dallas newspaper, Jacobs showed up in her living room (apparently Herman had left the keys in the door) to ask her about animals. Hermann's co-worker John Leggett scuttled Jacobs out of the house. Jail supervisor Joe Kempf testified that Jacobs, while awaiting trial, taunted him on one occasion. Dr. John Rennebohm, a psychiatrist who had examined Jacobs in connection with the Oregon assault, testified that Jacobs exhibited characteristics of an antisocial sociopathic personality and that it was "highly likely" that Jacobs would constitute a continuing threat to society.

(b) Analysis

In 1989, The Supreme Court found Texas' capital sentencing scheme (the same one here) unconstitutional as applied to capital defendant Johnny Paul Penry because it failed to "inform[] the jury that it could consider and give effect to the mitigating evidence of Penry's mental retardation and abused background by declining to impose the death penalty." *See Penry*, 492 U.S. at 328. (Texas has since amended the law, which now allows juries to consider "all evidence... that militates for or mitigates against the imposition of the death penalty." *See* TEX. CRIM. PROC. CODE ANN. § 37.071(d)(1) (Vernon Supp. 2002)). The decision was grounded in well-settled jurisprudence that the Eighth and Fourteenth Amendments require that a capital sentencing jury be able to "consider[] and give[] effect to evidence relevant to the defendant's background or character to the circumstances of the offense that mitigate against imposing the death penalty." *Penry*, 492 U.S. at 318. Penry's mental retardation and childhood abuse, however, were outside the scope of the deliberateness special issue (especially without a definition of "deliberately") and actually suggested an *affirmative* answer

7

to the second question of future dangerousness. *Id*. at 323-24.

In *Boyde v. California*, the Supreme Court held that in cases where a jury instruction could be interpreted unconstitutionally (e.g., the *Penry* instruction), "the proper inquiry ... is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that *prevents* the consideration of constitutionally relevant evidence." 494 U.S. 370, 380 (1990) (emphasis added). The *Boyde* jurors were asked, in a California capital sentencing, to consider "[a]ny other circumstance which extenuates the gravity of the crime," and defendant argued, unsuccessfully, that the instruction could be erroneously understood as preventing the jurors from considering mitigating circumstances not relating to the crime itself, such as defendant's background and character. *Id*. at 378. The Supreme Court in *Johnson v. Texas*, applying the *Boyde* standard to a *Penry*-instruction case, held that the failure to instruct a jury that they could consider petitioner's youth as mitigating was not error because t he petitioner's youth was within the "effective reach" of the future dangerousness special issue. 509 U.S. 350, 368 (1993).

With these cases in mind, this Court has explained that a *Penry* claim consists of two issues: "(1) whether the evidence was constitutionally relevant mitigating evidence, and if so, (2) whether the evidence was beyond the effective reach of the jurors." *See Boyd v. Johnson*, 167 F.3d 907, 911 (5th Cir. 1999) (citing *Davis v. Scott*, 51 F.3d 457, 460 (5th Cir. 1995)). "Relevant mitigating evidence, which is evidence that one is less culpable for his crime, must show '(1) a uniquely severe permanent handicap[] with which the defendant was burdened through no fault of his own,' and (2) that the criminal act was attributable to this severe permanent condition.'" *Id*. (citations omitted).

The mitigating evidence Jacobs offered at trial has nothing to do with any handicaps, and was within the effective reach of the future dangerousness special issue. A jury would no doubt consider

8

his good relations with the defense witnesses as evidence weighing against his future dangerousness. *See Boyd*, 167 F.3d at 907 ("Evidence of good character tends to show that the crime was an aberration, which may support a negative answer to the special issue regarding the future dangerousness of the defendant.").

Jacobs directs this Court's attention to the affidavits of various academics who, viewing the instructions in isolation, concluded that there was a reasonable likelihood that a jury mistakenly would think they could not take into account mitigating evidence. We doubt, however, that *this* jury failed to take into account the mitigating evidence because, again, the evidence Jacobs presented was precisely the sort of evidence contemplated in assessing his future dangerousness. Jury members were specifically instructed that, "in answering the special issues... you may take into consideration all of the facts shown by the evidence...." In any event, this precise challenge has been raised and rejected, *see Trevino*, 168 F.3d at 181-82, and we cannot overturn the decision of a previous panel based upon expert affidavits. Jacobs has not made a substantial showing that he was denied a constitutional right on claims relating to the consideration of mitigating evidence.

2. Whether the failure to define other key terms was constitutional error

Jacobs asserts that the failure of the jury instructions to define the terms "deliberately," "criminal acts of violence," "probability," "continuing threat," and "society" rendered the the jury instructions unconstitutional under *Boyde* because there was a reasonable likelihood that they were misunderstood. We have rejected these precise claims before. *See James v. Collins*, 987 F.2d 1116, 1119-20 (5th Cir. 1993) (not necessary to define "deliberately," "probability," "criminal acts of violence," or "continuing threat to society"); *Nethery v. Collins*, 993 F.2d 1154, 1162 (5th Cir. 1993) (not necessary to define "deliberately," "probability," or "society"). "To the extent that these words

9

strike distinct chords in individual jurors, or play to differing philosophies and attitudes, nothing more is at work than the jury system...." *James*, 987 F.2d at 1120 (quoting *Milton v. Procunier*, 744 F.2d 1091, 1096 (5th Cir. 1984)). Jacobs bolsters his claim with expert affidavits, but again, we cannot overrule prior panels based on expert affidavits.

Jacobs argues that the voir dire transcripts reveal that *this* jury actually misunderstood some of these terms. For instance, he points to record excerpts in which some of them had trouble articulating the difference between "deliberate" murder (the special issue term) and "intentional" murder (a requirement of capital murder). However, a careful and full reading of the record shows that lawyers for both sides engaged the jurors in long colloquies to explain the terms, and that all the jurors were told, and agreed to the fact, that a conviction for intentional murder did not automatically imply an affirmative answer to the deliberateness special issue.[1] Nothing in the record reveals that any juror actually misapplied the terms to the facts.

The fact that the jury instructions did not define certain terms does not constitute a substantial showing that Jacobs was denied a constitutional right.

<u>3. Whether Jacobs is entitled to a § 2254(e)(2) hearing</u>

Jacobs challenges the district court's decision not to hold an evidentiary hearing on whether the jury instructions were comprehensible. We review that denial for abuse of discretion. *See Murphy v. Johnson*, 205 F.3d 809, 815 (5th Cir. 2000). Under 28 U.S.C. § 2254(e)(2),

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

---

[1]For instance, one juror, who initially said there was "not a whole lot" of difference in the terms, was able to explain the difference—comparing deliberateness to premeditation and planning—after a colloquy with defense counsel.

10

(A) the claim relies on—

      (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

      (ii) a factual predicate could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Apart from the fact that Jacobs' failure to brief this point (he merely incorporates previous filings) amounts to a waiver of the issue, *see Peel & Co., Inc. v. The Rug Market*, 238 F.3d 391, 394 n.10 (5th Cir. 2001), the argument is unavailing. A review of Jacob's original federal habeas petition shows that he wanted the district court to hear testimony from various experts on how jurors would understand, or misunderstand, the instructions. As explained above, this Court has already decided that these exact instructions are not unconstitutionally vague, so even if the district court were to hold an academic symposium on the jury instructions, the legal result would be the same. Jacobs reasons do not meet the strict criteria of § 2254(e)(2); the district court did not abuse its discretion in denying a hearing.

C. Ineffective Assistance of Counsel

Jacobs argues that his trial lawyers were constitutionally inadequate at the sentencing phase because they only presented three witnesses, none of whom knew Jacobs very well. There was no evidence of Jacobs' rough upbringing or his mental and emotional problems, and trial counsel failed to call Jacobs' wife, daughter, brother, father and mother-in-law, who, the record shows, were willing to testify on Jacobs' behalf.

Jacobs first raised this issue in a state filing styled as a "supplemental" application to his original

application for a writ of habeas corpus. He concedes that the supplemental filing was untimely, and the Texas court dismissed it as an abuse of the writ. Under Texas law, a subsequent state habeas petition in a death penalty case will not be considered, except when: (1) the basis for the claim was previously unavailable; (2) but for a federal constitutional violation, no rational juror would have convicted the petitioner; or (3) but for a federal constitutional violation, no rational juror would have sentenced the petitioner to death. *See* TEX. CRIM. PROC. CODE Art. 11.071 § 5(a).

"In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). The *Murray* court noted that two examples of "cause" would be (1) the unavailability of the factual basis for a claim, or (2) state interference. *Murray*, 477 U.S. at 488.

Jacobs argues that Texas' procedure for funding his defense was the "external factor" impeding timely development of this claim. Texas required authorization before approving attorneys' fees and expenses above certain caps, and Jacobs' state habeas counsel (also counsel for this appeal) asserts that he was initially hesitant to work hours beyond which his fee would exceed the cap. An undated document he submitted stated that the Texas authorities would not "[a]s a general rule" award fee compensation above a $7500 cap. But, when it turned out that his first above-the-cap invoice *was*

12

approved— apparently a green light to counsel that he should continue working —the 180-day habeas time limit had already expired.

Again, we note that the substance of the argument was incorporated by reference, so the entire issue would ordinarily be waived. *See Peel*, 238 F.3d at 394 n.10. Nevertheless, after reviewing the substance of the claim, it is plainly meritless.

Texas' funding procedure, at least on these facts, is not the type of cause envisioned under *Murray* and *Coleman*. Jacobs concedes that the factual basis *was* available to trial counsel, and Jacobs' attempt to portray the funding rules as "state interference" is unavailing. The document counsel submitted states that lawyers who anticipate exceeding the caps should seek "*prior authorization*" from the Texas courts, but counsel has not argued that he was actually denied any necessary fees, nor has he explained why he did not try to obtain prior authorization for funds to pursue this issue at any time within the 6-month statutory window.

We also note that Jacobs was able to raise 17 issues in his original (and timely) state habeas petition, and that those were probably the issues counsel thought the strongest.

D. Sufficiency of the Evidence

Jacobs contends that there was insufficient evidence that he committed, or attempted to commit, a burglary on the night of the murder. Without at least an attempted burglary, Jacobs could not have been convicted of capital murder, *see* TEX. PENAL CODE § 19.03, and subjected to the death penalty. Kuper testified that, immediately after the murder, a $100 bill was missing from her wallet and that the contents of her purse had been scattered. Jacobs had several $100 bills in his pocket when he was arrested. Jacobs points out that there were no fingerprints on the purse, and that the fact Jacobs possessed the $100 bills is explained by a pay stub, which was also in his possession upon arrest.

13

The Supreme Court has held that review of the sufficiency of evidence of a state conviction requires the court to ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Viewing the evidence in the light most favorable to the prosecution, Jacobs was at the Harris and Kuper home immediately before a $100 bill was missing, and was in possession of several $100 bills soon after. The Texas Court of Criminal Appeals' conclusion that the evidence was sufficient was not an unreasonable application of the facts to the law, under the very deferential *Jackson* standard of review. Jacobs has failed to make a substantial showing that he was denied a constitutional right with respect to the sufficiency of the evidence.

E. Harris' Identification of Jacobs

Jacobs asserts that Harris' identification of him was unconstitutionally unreliable and tainted by unduly suggestive prosecutorial tactics. In particular, Jacobs says that Harris' description and sketch of the person he saw did not match some of Jacobs' features, nor did it match Kuper's sketch; that Harris initially tentatively identified someone other than Jacobs; that Jacobs was required to stand, open his shirt and wear a Panama hat before Harris identified him; and, that prosecutors showed Harris photos of Jacobs in order to "coach" him into identifying Jacobs.

Harris testified that he saw the assailant in a well-lit room from a short distance for at least five seconds. He initially told police that he saw a "compact" and "short" man with a powerful build. The day of the murder, Harris tentatively identified someone other than Jacobs from a photographic lineup that did not include Jacobs. Harris testified that he told police, "This picture looks most like the man, but I can't say it is," and "This is as close as you've got." When Harris actually saw him in person,

Harris told police that "He wasn't even close" because, among other things, "His height is wrong."

After Jacobs' arrest, police showed Harris photos of Jacobs along with Jacobs' written statement admitting that he was in Harris' home the morning of the murder.[2] Harris said that Jacobs looked like the assailant, but he wanted to see him in person to be absolutely sure. At a pre-trial identification hearing, Jaco bs was made to stand before Harris wearing the Panama hat, and Harris positively identified him. Harris was subjected to vigorous cross-examination at trial.

The Supreme Court has held "that reliability is the linchpin in determining the admissibility of identification testimony" under the Due Process Clause. *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). We follow a two-step analysis, asking "first whether the identification procedure was impermissibly suggestive and second, whether the procedure posed a 'very substantial likelihood of irreparable misidentification.'" *United States v. Rogers*, 126 F.2d 655, 658 (5th Cir. 1997) (citation omitted). "If the answer to both questions is yes, the identification is not admissible." *Id*.

The Texas Court of Criminal Appeals concluded that there was not a substantial likelihood of irreparable misidentification. The five factors we use to evaluate the likelihood of misidentification are "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil v. Biggers*, 409 U.S. 188, 199 (1972). Cross examination "exposes to the jury

---

[2]In the written statement, Jacobs claimed that he had been having an affair with Kuper for three months, and that she would sometimes lend him money by placing cash in her house and leaving the back door open. Jacobs wrote that he came to see Kuper that morning and stumbled upon a "prowler" who "jumped [him] from behind" and cut his arm. After Jacobs repelled the prowler, according to the statement, Harris emerged from the bedroom and saw Jacobs, who then picked up the dinner knife to scare Harris.

The trial judge granted Jacobs' motion to suppress the statement.

the method's potential for error" and "substantially lessen[s]" the risk of misidentification. *Simmons*, 390 U.S. at 384. Against these factors, we "weigh[] the corrupting effect of the suggestive identification itself." *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

Harris had ample opportunity to get a good look at the assailant, with his full attention on the assailant. His descriptions of the assailant immediately after the murder match Jacobs' description, and he testified he was absolutely certain that he had identified the assailant. We conclude that the Texas Court of Criminal Appeals' determination that the identification procedures did not pose a substantial risk of misidentification was not unreasonable, and that Jacobs has failed to raise a substantial showing that he was denied a constitutional right with respect to the identification procedures.[3]

F. Exclusion of Expert Testimony

The trial court excluded testimony from forensic psychologist Dr. Robert Powitzky, who would have testified about the unreliability of eyewitness testimony in general, and about the possibility that Harris misidentified Jacobs. Dr. Powitsky reviewed the transcript of Harris' testimony and, at a non-jury hearing, testified that the following factors would call into question Harris' identification of Jacobs: (1) Harris only viewed Jacobs for a few seconds; (2) Harris was under a lot of stress, which reduces the accuracy of identifications; (3) Harris was probably less focused on the assailant's face because eyewitnesses tend to focus on weapons; (4) Harris was shown a photo of Jacobs and told that Jacobs confessed; (5) Harris conferred with Kuper in identifying Jacobs; (6) Harris needed closure; and (7) Harris' in-court identification was nine months after the incident.

---

[3]In the same section of his brief, Jacobs argues that the alleged coaching constituted prosecutorial misconduct. That argument was not raised below and is procedurally barred because he has not shown any cause for failing to raise it below. *See Coleman*, 501 U.S. at 750.

The trial judge noted that the prosecution had more than just eyewitness testimony placing Jacobs at the scene, and that cross-examination was sufficient to point out the potential for misidentification. The Texas Court of Criminal Appeals held that the trial court's decision was not an abuse of discretion, and that any error would have been harmless in light of all of the other evidence inculpating Jacobs. Jacobs argues that excluding the testimony denied his Due Process rights.

The Supreme Court has held that "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *United States v. Scheffer*, 523 U.S. 303, 308 (1998). A "state trial court's evidentiary ruling will mandate habeas relief when errors are so extreme that they constitute a denial of fundamental fairness." *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998).

Jacobs' trial counsel vigorously cross-examined Harris on many of the points Dr. Powitzky identified, and those points were also discussed at length in closing arguments. We do not think that the exclusion rendered the trial fundamentally unfair.

Jacobs directs our attention to *United States v. Smithers,* in which a divided Sixth Circuit panel reversed a federal bank robbery conviction because the trial court failed to conduct a hearing on whether to admit testimony from an expert on eyewitness testimony. 212 F.3d 306 (6th Cir. 2000). While *Smithers* provides a useful discussion of the problems of eyewitness testimony in general, it is not persuasive authority in this case. First, *Smithers* is a direct appeal of evidentiary ruling, and does not bear on the more deferential, constitutional threshold at issue on habeas. Second, the *Smithers* trial court's error was failing to even hold a hearing to properly consider the testimony; *Smithers* does not hold that the witness should have been allowed to testify.

We conclude that the Court of Criminal Appeals' analysis was reasonable, and Jacobs has not

made a substantial showing that he was denied a constitutional right with respect to the exclusion.

G. Unlawful Arrest

Jacobs argues that his arrest violated the Fourth Amendment. Jacobs had a full and fair opportunity to litigate this issue in state court, and under *Stone v. Powell*, 428 U.S. 465, 494 (1976), the claim is not cognizable on habeas.

According to Jacobs, Congress abolished the *Stone v. Powell* distinction between Fourth Amendment claims and other claims when it amended the federal habeas laws in the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214. We conclude, however, that *Stone v. Powell* is still good law. In a post-AEDPA case, the Supreme Court noted that *Stone v. Powell* was "well settled," *Williams v. Taylor,* 529 U.S. 362, 375 (2000), and this Court has applied the rule to post-AEDPA cases. *See, e.g., Jones v. Johnson*, 171 F.3d 270, 278 (5th Cir. 1999); *Lucas v. Johnson*, 132 F.3d 1069, 1083 (5th Cir. 1998).

## IV. CONCLUSION

For the above reasons, petitioner's application for a COA is denied.